**RITH ENERGY, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 99–5153.

United States Court of Appeals, Federal Circuit.

DECIDED: Nov. 5, 2001.

Rehearing and Rehearing En Banc Denied: Nov. 5, 2001.*

---

\* The merits panel issues a precedential opinion simultaneously.

Raymond D. Battocchi, Gabeler, Battocchi & Griggs LLC, of McLean, VA, filed a combined petition for panel rehearing and rehearing en banc for plaintiff-appellant. With him on the brief were John R. Powell and Vicki A. Paisley. Of counsel on the brief was Walter H. Fleischer, of Washington, DC.

Katherine J. Barton, Attorney, Environmental and Natural Resources Division, Department of Justice, of Washington, DC, filed a response for defendant-appellee. With her on the brief was Susan V. Cook, Attorney. Of counsel on the brief was Thomas A. Bovard, Attorney, Office of the Solicitor, Department of the Interior, of Washington, DC.

Glenn Sugameli, Senior Counsel, National Wildlife Federation, of Washington, DC, for amicus curiae National Wildlife Federation.

Nancie G. Marzulla, Defenders of Property Rights, of Washington, DC, for amicus curiae National Mining Association.

Before MAYER, Chief Judge, LOURIE, and BRYSON, Circuit Judges.

ON PETITION FOR REHEARING

BRYSON, Circuit Judge.

Appellant Rith Energy, Inc., has filed a petition for rehearing. The petition focuses principally on the Supreme Court's decision in *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), a case that was decided two months after the opinion in this case issued. Rith contends that *Palazzolo* is contrary to the analysis in our opinion and requires that the judgment be changed. We disagree. As we read *Palazzolo*, it is not inconsistent with either the judgment or the analysis in our opinion. We therefore deny the petition for rehearing.

### 1

■ Rith first challenges our conclusion that the asserted taking in this case was not categorical. We reached that conclusion after noting that the suspension and subsequent revocation of Rith's mining permit did not deprive Rith of all value in its coal leases, since Rith was able to mine approximately 35,700 tons of coal from the lease area, or about nine percent of what it hoped to mine if its mining permit had not been suspended and ultimately revoked. Rith suggests that the 91 percent reduction in the amount of the coal that it expected to mine "has wiped out virtually all of the property's value" and that the resultant taking, "if not complete, [is] very close to it."

As to whether the claimed 91 percent reduction in the amount of coal Rith has been allowed to mine constitutes a categorical taking of Rith's property under its coal leases, *Palazzolo* is distinctly unhelpful to Rith. The Supreme Court held that because Mr. Palazzolo retained some economic value in the regulated property, the denial of a building permit in Mr. Palazzolo's case did not constitute a categorical taking. In particular, the Court accepted the state court's finding that Mr. Palazzolo's property retained $200,000 in development value under the state's wetlands regulation, as contrasted with Mr. Palazzolo's estimate that the investment value of the property absent the wetlands regulations would be approximately $3,185,000. Although the value remaining in the property after the regulatory action was only about six percent of the value that Mr. Palazzolo expected to derive from the project, the Court ruled that the remaining value was not "a token interest" that left the property "economically idle." 121 S.Ct. at 2464, 2465. The Court therefore rejected Mr. Palazzolo's argument that he suffered a total, or categorical, taking.

■ The Court's ruling on that point is consistent with earlier Supreme Court decisions in which the Court has held that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (approximately 75% diminution in value), and *Hadacheck v. Sebastian,* 239 U.S. 394, 405, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (92.5% diminution); *see also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019–20 n. 8, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (suggesting that a 95% diminution in value would not constitute a categorical taking).

The same principle applies here, where the percentage value remaining to Rith despite the regulatory action was greater than the percentage value remaining to Mr. Palazzolo. The diminution in the value of the coal lease therefore does not, by itself, establish a categorical taking.

In support of its contention that the asserted taking in this case was categorical, Rith argues that the amount of coal that it was permitted to mine during the time its permit was in effect is irrelevant. According to Rith, the nature of the taking must be measured by the economic value remaining in the coal leases at the time the permit was revoked. Because the revocation of the permit prevented Rith from taking any more coal from the leased property, Rith argues that the permit revocation deprived it of all of its remaining property, i.e., 100 percent of the coal that was left in the ground. We reject that argument. As we explained in our initial opinion, it is artificial to divide the interests in the coal lease in the way that Rith proposes and to disregard the coal that

had already been mined under the permit when the Office of Surface Mining Regulation and Enforcement ("OSM") reversed itself and revoked the permit. Regulatory action that limits a coal lease owner to removing only 10 percent of the available coal at the outset cannot be meaningfully distinguished from a course of regulatory action that initially permits unrestricted mining but then, after 10 percent of the coal has been removed, prohibits the owner from taking the remaining 90 percent. The effect of the regulatory action in this case was to permit Rith to take some coal from the property that was the subject of its leases and then to prohibit it from taking any more. The course of regulatory action, viewed as a whole, did not deprive Rith of all the economic value in its coal leases and thus did not constitute a categorical taking of Rith's property.

2

■ Rith's principal argument in its petition for rehearing is that after *Palazzolo* "the mere fact that an owner bought after a regulatory scheme was passed cannot defeat a partial takings claim." Citing *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), Rith argues that it was "entitled to stand in the shoes of its predecessors who owned before SMCRA [the Surface Mining Control and Reclamation Act of 1977]." The implication of Rith's argument seems to be that in assessing Rith's investment-backed expectations, it was improper for this court to assign any weight to the regulatory regime established by SMCRA.

Neither *Palazzolo* nor *Nollan* holds that investment-backed expectations are irrelevant in analyzing a regulatory taking. The *Palazzolo* Court rejected the argument that when governmental action regulates the use of property, a person who purchases property after the date of the regulation may never challenge the regulation under the Takings Clause. 121 S.Ct. at 2462. As the Court explained, "A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." 121 S.Ct. at 2463. In rejecting such a "blanket rule," however, the Court did not suggest that the reasonable expectations of persons in a highly regulated industry are not relevant to determining whether particular regulatory action constitutes a taking. Justice O'Connor, a member of the five-Justice majority in *Palazzolo*, made that point explicitly in her concurrence, where she wrote:

Today's holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis. Indeed, it would be just as much error to expunge this consideration from the takings inquiry as it would be to accord it exclusive significance.... [I]nterference with investment-backed expectations is one of a number of factors that a court must examine. Further, the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations.

121 S.Ct. at 2465–66 (O'Connor, J., concurring).

As Justice O'Connor's opinion indicates, the role of investment-backed expectations in regulatory takings cases is well settled. Indeed, only three years ago in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), the four-Justice plurality reaffirmed the role of investment-backed expectations in regulatory takings analysis. Justice O'Connor, writing for herself and three other Justices who were in the majority in *Palazzolo*, reiterated that among the factors that are entitled to "particular significance" in reg-

ulatory takings analysis is the regulation's "interference with reasonable investment backed expectations." 524 U.S. at 523, 118 S.Ct. 2131; *see also id.* at 532, 118 S.Ct. 2131; *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). If the Court in *Palazzolo* had intended to discard this long-standing element of regulatory takings analysis it presumably would have been more explicit about doing so.

*Nollan* is no more helpful to Rith. The passage from *Nollan* on which Rith relies states:

> Nor are the Nollans' rights altered because they acquired the land well after the Commission had begun to implement its policy. So long as the Commission could not have deprived the prior owners of the easement without compensating them, the prior owners must be understood to have transferred their full property rights in conveying the lot.

483 U.S. at 833–34 n. 2, 107 S.Ct. 3141.

In that passage, the *Nollan* Court explained that the state was not entitled to an easement across the Nollans' property simply because the state had announced its policy requiring property owners to transfer such an easement prior to the time the Nollans purchased their land. That passage is couched in terms of a physical taking; the majority was simply stating that the timing of the state's announcement of its policy does not alter the fact that the fundamental nature of the action of obtaining an easement over land is a physical occupation, as opposed to a "mere restriction on its use," as suggested in a dissenting opinion. *See Nollan,* 483 U.S. at 848–49 n. 3, 107 S.Ct. 3141 (Brennan, J., dissenting). We do not read the passage quoted by Rith to suggest that, in the context of a regulatory taking, the fact

that a regulatory regime was in place before the owner purchased the property is irrelevant to the owner's investment-backed expectations.

In this case, which involves a business engaged in a highly regulated industry, the plaintiff's reasonable investment-backed expectations are an especially important consideration in the takings calculus. A party in Rith's position necessarily understands that it can expect the regulatory regime to impose some restraints on its right to mine coal under a coal lease. The leases themselves notified Rith of the uncertainty of obtaining permits to mine, and the low price that Rith paid for the leases may well reflect the widely understood risk that Rith would not be permitted to extract as much coal as it hoped from the leased properties. The likelihood of regulatory restraint is especially high with regard to possible adverse environmental effects, such as potentially harmful runoff from the mining operations, which have long been regarded as proper subjects for the exercise of the state's police power.

In sum, our conclusion that reasonable investment-backed expectations play an important role in regulatory takings cases is not inconsistent with anything in the Supreme Court's decisions in *Nollan* and *Palazzolo.* In its starkest form, the argument that the Supreme Court rejected in *Nollan* and *Palazzolo* suggests that the government may take any private property without compensation as long as it announces far enough in advance its intention to do so. To reject such a "blanket rule," as the *Palazzolo* Court termed it, falls far short of suggesting that reasonable investment-backed expectations no longer have a role to play in regulatory takings analysis.

3

■ Two other factors that the Supreme Court has emphasized as especially

important in the analysis of regulatory takings are the nature of the governmental action and the diminution in value caused by that action. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. Rith argues that even if the regulatory action in this case does not constitute a categorical taking, and the *Penn Central* analysis applies, it should prevail. We disagree.

Although the regulatory action in this case caused a substantial diminution in the value of Rith's coal leases, it did not deprive Rith of its opportunity to make a profit on the leases; it simply reduced the margin of profit that Rith had hoped to achieve. The record reflects that the coal that Rith was able to mine resulted in a substantial profit for its investors in light of the price paid for the coal lease. Thus, the permit revocation in this case, like the regulation at issue in *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 485, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), did not "make[ ] it impossible for [Rith] to profitably engage in [its] business."

With respect to the nature of the governmental action, the revocation of the permit, as we suggested earlier, was an exercise of the police power directed at protecting the safety, health, and welfare of the communities surrounding the Rith mine site by preventing harmful runoff. The exercise of the police power to address that kind of general public welfare concern is the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations. *See Keystone,* 480 U.S. at 488–92, 107 S.Ct. 1232; *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (land use regulation does not effect a taking if it "substantially advance[s] legitimate state interests"); *Penn Central,* 438 U.S. at 127, 98 S.Ct. 2646 (use restriction on property is not a

taking if it is "reasonably necessary to the effectuation of a substantial government purpose").

4

Finally, Rith continues to press its assertions that the government's decisions in this case were driven by political pressure, that Rith's mining activities did not present a significant risk of harmful acid mine drainage, and that Rith was unfairly singled out for disparate treatment. Those are claims that Rith either raised or could have raised in the administrative and judicial challenge to the denial of its permit. That challenge resulted in a ruling sustaining the permit denial on the merits, and findings by an administrative law judge that "the overburden [in Rith's mine] had a high propensity to produce acid mine drainage," and that Rith's abatement plan "would not accomplish the necessary reclamation of the site nor would it prevent damage to the hydrologic balance." In light of the conclusion reached by both the administrative law judge and the Court of Federal Claims that Rith's mining proposal presented what the Court of Federal Claims judge called a "high probability of pollution of an aquifer," we have no basis from which to conclude that Rith was singled out for rejection because of political pressures brought to bear on OSM, and that but for those improper considerations, Rith's permit would not have been revoked.

In any event, in a takings case we assume that the underlying governmental action was lawful, and we decide only whether the governmental action in question constituted a taking for which compensation must be paid. Rith's complaints about the wrongfulness of the permit denial are therefore not properly presented in the context of its takings claim. The only question before us is whether Rith was

entitled to be compensated for the effects of that action. Under the precedents discussed in our original opinion, which we do not believe have been undermined by the Supreme Court's decision in *Palazzolo*, we conclude that the revocation of Rith's mining permit did not constitute a taking for which Rith is entitled to compensation.

The petition for rehearing is denied.