MARITRANS INC., et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 96–483 C.

United States Court of Federal Claims.

Dec. 21, 2001.

---

Laurie Frost Wilson, Robins, Kaplan, Miller & Ciresi, LLP, Washington, D.C., and Stephen A. Saltzburg, Washington, D.C., for plaintiff.

William K. Olivier and Lauren S. Moore, United States Department of Justice, Washington, D.C., for defendant.

## OPINION and ORDER

HODGES, Judge.

This is a claim for a taking under the Fifth Amendment of the United States Constitution. Plaintiffs allege that eight of their ocean-going tank barges were taken by the double-hull requirement of section 4115 of the Oil Pollution Act of 1990 (OPA 90). Pub.L. No. 101–380, 104 Stat. 484 (codified as amended at 46 U.S.C. § 3703a(a)–(c) (2001)). They argue that a regulatory taking occurred when OPA 90 was enacted, and that a categorical taking occurs from the retirement date of each vessel approximately 15 years later.

## I. BACKGROUND

Maritrans purchased Sonat Marine's tank barge fleet for approximately $240 million in 1987. The capital for the purchase was raised by debt financing in the form of a fleet mortgage and the sale of limited partnership units. Maritrans allocated the following purchase prices to the eight barges in the suit:

| | | |
|---|---|---|
| Ocean 90 | (1967) | $3,200,000 |
| Ocean 96 | (1969) | $2,200,000 |
| Ocean 115 | (1968) | $3,000,000 |
| Ocean 135 | (1969) | $2,200,000 |
| Ocean 155 | (1974) | $4,200,000 |
| Ocean 244 | (1971) | $8,000,000 |
| Ocean 255 | (1971) | $7,500,000 |
| Maritrans 192 | (1979) | $8,000,000 |

Since purchasing the fleet in 1987, Maritrans has operated its tank vessels under the authority of 46 U.S.C. § 883 (2001), the Jones Act. The Jones Act requires that vessels engaged in point-to-point shipping within the United States be built in the United States and be owned and operated by citizens of the United States. Maritrans provides marine transportation, storage, and distribution coordination services primarily to integrated oil companies, independent oil companies, and oil distributors on the Gulf and East Coasts.

The Oil Pollution Act of 1990 requires that all single-hulled tank vessels be retrofitted with double hulls to operate in Jones Act trade or be phased out of service according to a retirement schedule that began in January 1995. The eight vessels in this lawsuit have retirement dates ranging from 2002 to 2005.

Maritrans used each of the barges in this lawsuit after the passage of OPA 90. It retrofitted Maritrans 192 in 1999, and sold five vessels in 2000. Ocean 255 became a casualty loss as a result of a collision in 1996. Maritrans is retrofitting the eighth vessel, Ocean 244. Maritrans argues that its vessels were effectively taken by the enactment of OPA 90 because as of the retirement date, single-hull tank vessels in the Maritrans fleet will have no value.

We concluded that plaintiffs have a Fifth Amendment property interest in their vessels, *Maritrans Inc. v. United States,* 40 Fed.Cl. 790 (1998), and that they had reasonable investment-backed expectations when they acquired the vessels at issue. *Maritrans Inc. v. United States,* 43 Fed.Cl. 86 (1999); *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

We dismissed this case as premature, however, because plaintiffs stated that retrofitting was not economically feasible, and that no barges had been scrapped or sold in reliance on the approaching effective date of OPA 90. Plaintiffs moved to reconsider, advising the court that 10 barges in fact had been sold, retrofitted, or scrapped, and were ripe for a takings analysis. We reopened the case to address the economic impact of OPA 90 on eight barges.

Plaintiffs assert that a regulatory taking of their single-hull tank vessels occurred during the period between passage of OPA 90 and the retirement dates set forth for each vessel in that law. "It is for this time period that the three-pronged regulatory taking analysis of *Penn Central* is to be applied," according to plaintiffs. Apparently, they also are arguing that a categorical taking will occur on and after OPA 90's statutory retirement dates for each of their single-hull tank barges. Those dates have not yet arrived for any vessels in Maritrans' fleet.

Plaintiffs argue in their post-trial brief that OPA 90's double-hull requirement "effects a taking of plaintiffs' single-hull tank barges after their respective OPA 90 retirement dates because the statute denies plaintiffs all economically viable use of their barges after these dates." However, the law of this case is that barges not sold, scrapped, or retrofitted in reliance on the regulation are not ripe for a takings analysis.

Plaintiffs seem to be seeking compensation for a categorical taking of either (1) barges that are not in this case; or (2) barges for which they also are seeking a regulatory taking. We understand their argument to be that the eight barges disposed of were taken according to the *Penn Central* analysis. Neither theory supports a taking, however.

## II. DISCUSSION

■ The Takings Clause does not prohibit the taking of property but requires the Government to compensate for interference with property. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 314–15, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). A taking claim requires that the plaintiff establish that it was the owner of property and that such property was taken by the United States for a public use. *Shanghai Power Co. v. United States,* 4 Cl. Ct. 237, 239–40 (1983), *aff'd* 765 F.2d 159 (Fed.Cir.), *cert. denied* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). Plaintiffs' Fifth Amendment property interest in their vessels was determined in a prior opinion. *Maritrans,* 40 Fed.Cl. 790 (1998).

### A. Categorical Taking

Plaintiffs' categorical analysis evidently is based on the possibility that their vessels will become worthless on the retirement dates mandated by OPA 90. Those vessels are not in this lawsuit. In any event, *Rith Energy* disposes of the categorical argument.

Rith argues that the permit revocation deprived it of all of its remaining property, i.e., 100% of the coal that was left in the ground. We reject that argument.... [I]t is artificial to divide the interests in the coal lease in the way that Rith proposes and to disregard the coal that had already been mined under the permit ... [before it was revoked]. The course of regulatory action viewed as a whole, did not deprive Rith of all the economic value in its coal leases and thus did not constitute a categorical taking of Rith's property.... Although the regulatory action in this case caused a substantial diminution in the value of Rith's coal leases, it did not deprive Rith of its opportunity to make a profit on the leases; it simply reduced the margin of profit that Rith had hoped to achieve.

*Rith Energy v. United States,* 270 F.3d 1347 (Fed.Cir.2001).

Plaintiffs bought their ships in 1987. OPA 90 passed in 1990. It becomes effective in 2005. By analogy to *Rith,* it can be said that Maritrans had a permit to carry oil in Jones Act trade for 15—18 years relatively free of regulation. After that, its "permit" to continue will be denied. Maritrans will not be permitted to use those vessels for the purpose intended. According to *Rith,* we cannot disregard income or other benefits to plaintiffs from the earlier years in considering their economic impact from the phase-out. A 91 percent reduction in value was not sufficient for a categorical taking in *Rith. Lucas* suggests that 95 percent may not be sufficient. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

Plaintiffs attribute to the Government the argument that "it does not matter what the value of the vessels would have been on their retirement dates but for OPA 90; it does not matter how much more money Maritrans expected to make after each vessel's respective retirement date; and it does not matter whether the vessels appreciated significantly in value from the time they were acquired in 1987." Plaintiffs view this as a "contrived legal theory [that is] absurd and an insult to all property owners in this country ... [and] has absolutely no support in the law whatsoever." Yet defendant's argument states the law reasonably well. *See e.g. Concrete Pipe and Products v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking."); *Rith Ener-*

*gy v. United States,* 247 F.3d 1355, 1362 (Fed.Cir.2001) (no taking because regulatory action "simply reduced the margin of profit that Rith had hoped to achieve."); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15–16, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ("legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.")

It is appropriate to look at the extent to which Maritrans has been able use its barges throughout the period of its ownership. *See Rith Energy,* 270 F.3d at 1352. Plaintiffs focus on their inability to use the barges after their retirement dates, but they operated the vessels in commerce for ten years or more. Maritrans sold five of the vessels in this lawsuit for an average of 92 percent of the price it paid for them in 1987. It received $7.8 million in insurance proceeds for the loss of Ocean 255, which is 100.4 percent of its purchase price. The two retrofitted vessels will continue to produce income in Jones Act trade. Plaintiffs argue that retrofitting resulted in the destruction of their single-hull vessels and the creation of "new" vessels. If so, plaintiffs used at least 80 percent of the steel from the original vessel in the creation of the new one. If plaintiffs relied on OPA 90 in selling five of the barges and retrofitting two, they obtained fair market value for those sold and will continue to use the retrofitted barges.

■ In determining whether a taking is categorical, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Rith Energy,* 247 F.3d at 1363 quoting *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 905 (Fed.Cir.1986), *cert denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Maritrans had hoped to make more money from its barges than it did, just as Rith wanted a greater profit from its coal leases. But Maritrans had income from the vessels for 10 years or more and recouped its money from sale of five of the barges. *Rith* does not permit Maritrans to separate the years that it used the vessels profitably from the time when the vessels must be retired, to claim a categorical taking.

## B. Regulatory Taking

■ The Supreme Court has established three criteria for determining whether a regulatory taking has occurred: (1) the character of the governmental action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct investment-backed expectations. *See Loveladies Harbor v. United States,* 28 F.3d 1171, 1176–77 (Fed.Cir.1994) (citing *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

We ruled that plaintiffs had investment-backed expectations when they acquired the barges at issue. Testimony from Coast Guard officers and other specialists in the industry established that plaintiffs could not reasonably have anticipated that double hulls would be required during the estimated working lifetime of the vessels. *Maritrans,* 43 Fed.Cl. 86 (1999).

### 1. Character of Government Action

■ The character of the government action test "requires the court to consider the purpose and importance of the public interest underlying the regulatory imposition ... courts must inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Creppel v. United States,* 41 F.3d 627 (Fed.Cir.1994).

A party challenging government action in a taking bears a substantial burden. *See United States v. Sperry Corp.,* 493 U.S. 52, 60, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). Government regulation often "curtails some potential for the use or economic exploitation of private property" because regulation "involves the adjustment of rights for the public good." *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). The court will consider justice and fairness, however, including considerations of the extent to which the government action complained of is retroactive, and whether the action targets a particular individual.

Congress may impose retroactive liability to some degree, particularly where it is "con-

fined to short and limited periods required by the practicalities of producing national legislation." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), quoting *United States v. Darusmont*, 449 U.S. 292, 296–97, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981). To the extent that OPA 90 applies to vessels that were acquired before 1990 and could have been used beyond their mandated retirement dates, it is a retroactive law. The 15–year phase-out period lessened the impact of retroactivity in this case, however, and the need for producing national legislation is a factor that favors the Government.

With regard to targeting, the Supreme Court has ruled that restrictions on property rights are acceptable so long as "the burdens they impose are not so wholly disproportionate to the burdens other individuals face in a highly regulated society that some people are being forced 'alone to bear public burdens which, in all fairness and justice, must be borne by the public as a whole....'" *United States v. Locke*, 471 U.S. 84, 107 n. 15, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

The double-hull requirement was intended to benefit the public. It is a burden for Maritrans, but it is not borne exclusively by Maritrans. Any vessel that carries oil in Jones Act trade must have a double hull beginning in 2005. Although Congress placed new burdens on plaintiffs and others in the industry, it did not prohibit them from doing business.

 "[W]here the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the fifth amendment is not required." *Radioptics, Inc. v. United States*, 223 Ct.Cl. 594, 621 F.2d 1113, 1127 (1980). "Oil ... in our rivers and harbors is both a menace to navigation and a pollutant." *United States v. Standard Oil*, 384 U.S. 224, 226, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). OPA

90 passed after the Exxon Valdez spill off the Alaska coast. The character of government action in this case is not consistent with a taking.

## 2. Economic Impact

 The economic impact test is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor*, 28 F.3d at 1176. *See also Pennsylvania Coal*, 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). The focus of this factor is on the change in the fair market value of the subject property caused by the regulatory imposition. In other words, the court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). This factor usually is determined by a fraction, the numerator of which is the value of the subject property encumbered by regulation and the denominator of which is the value of the same property not so encumbered. *Keystone*, 480 U.S. at 497, 107 S.Ct. 1232.

Maritrans argues that the value taken by OPA 90 is the profits lost over the remaining useful life of the barges. For the purposes of this opinion, we accept that measure of value and use the numbers provided by plaintiffs.

The denominator is the value of the property before the taking. That amount is $93,772,324.[1] This number includes expected profits from Ocean 255 even though this barge was a casualty loss. The numerator in this case is the amount that plaintiffs received for the barges plus profits that plaintiffs made during the phase-out period. The

1. We adopted plaintiffs' projection of expected cash flow for each vessel as well as their predict-

ed life expectancy.

numerator is $81,497,147.[2]

If the resulting percentage is so great that it creates an unfair burden for the plaintiffs to bear, and the other factors do not disquali-fy the owners, the court may find a taking. The imposition of OPA regulations diminish-ed the value of plaintiffs' property by approx-imately 13.1 percent.

| Vessel | Denominator (Profits beyond 2005) | Numerator (Sale price or insurance proceeds + EBITDA during phaseout) |
|---|---|---|
| Ocean 244 | 17,637,537 | 12,247,040 |
| Maritrans 192 | 14,661,703 | 7,297,289 |
| Ocean 90 | 6,432,832 | 2,400,000 + 5,470,416 |
| Ocean 96 | 6,647,750 | 2,200,000 + 4,759,299 |
| Ocean 115 | 8,115,862 | 2,700,000 + 6,553,244 |
| Ocean 135 | 9,424,548 | 3,000,000 + 7,609,956 |
| Ocean 155 | 12,356,514 | 3,400,000 + 8,260,873 |
| Ocean 255 | 18,495,577 | 7,800,000 + 7,799,030 |

Several Supreme Court decisions suggest that diminutions in value approach-ing 85 to 90 percent do not necessarily estab-lish a taking. *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking despite 75 percent diminu-tion); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348(1915) (no taking despite 87.5 percent diminution). This court likewise has relied on diminutions in excess of 85 percent before finding a regulatory taking. *See Loveladies Harbor*, 21 Cl.Ct. 153, 160 (1990) (99 percent), *aff'd* 28 F.3d 1171 (Fed.Cir.1994); *Bowles v. United States*, 31 Fed.Cl. 37, 48–49 (92–100 percent); *Formanek v. United States*, 26 Cl.Ct. 332, 340 (1992) (88 percent).

Maritrans' Vice President testified, "we sold off our small and mid-size barge fleet operating in the northeast and a major part of that decision was driven by the fact that the five lawsuit barges that are listed in the exhibits, they've generated the largest cash flow for us, but they also had the shorter lives of our fleet." OPA 90 gave plaintiffs time to use their property before the law took effect. In fact, the purpose of the phase-out period was to allow owners to ad-just to the new rules. Plaintiff made a series of legitimate business decisions. They con-tinued to use some of the barges, they retro-fitted some, and some they sold.

The barges were not valueless. Plaintiffs found willing buyers and sold them for fair market value. If plaintiffs are arguing that the value would have been greater absent OPA 90, that is the sort of diminution that the courts have held does not create a taking. If plaintiffs could not make all the money from their fleet that they hoped, significant value remains nevertheless. A taking does not occur in such circumstances.

**CONCLUSION**

OPA 90 did not result in a taking of plain-tiff's property. Plaintiffs used the vessels in their business and derived income from them during the phase-out period. Plaintiffs sold the vessels for substantially what they paid for them. Neither a categorical nor a regu-latory takings applies to the facts of this case. The clerk will enter judgment for de-fendant. No costs.

**2.** This number depends on plaintiffs' estimation of earnings before interest, tax, depreciation, amortization (EBITDA), and vessel capacity.