ROBERTA GOVE[1] *vs.* ZONING BOARD OF APPEALS OF CHATHAM
& another[2] (and a companion case[3]).

Barnstable. April 4, 2005. - July 26, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Zoning,* By-law, Building permit, Wetlands. *Regulation. Constitutional Law,*
Taking of property. *Due Process of Law,* Taking of property.

In an action challenging a local zoning board's denial of a residential building
permit for a parcel of land located within a coastal conservancy district,
the evidence clearly established a reasonable relationship between the local
bylaw prohibiting residential construction within the district and legitimate
State interests (i.e., the protection of rescue workers and residents, the ef-
fectiveness of the town's resources to respond to natural disasters, and the
preservation of neighboring property) [759-761]; further, the evidence did
not demonstrate that the bylaw, which allowed specified nonresidential
uses, denied the landowner all economically beneficial use of the property
so as to effect a total regulatory taking [761-764] or that the bylaw had a
substantial economic impact on the landowner or deprived her of distinct
investment-backed expectations in her land [764-767].

CIVIL ACTIONS commenced in the Superior Court Department
on March 12, 1999, and July 27, 2000.

After consolidation, the cases were heard by *Richard F. Con-
non,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*William F. Riley* for Roberta Gove.

*Bruce P. Gilmore* for Zoning Board of Appeals of Chatham
& another.

---

[1] In the proceedings below Ann K. Grenier (now deceased) and Donald J.
Grenier were also named plaintiffs. A judge in the Superior Court ruled that
the Greniers lacked standing to bring a takings claim, and they did not contest
his ruling. A takings claim is the only issue on appeal. Although counsel on
appeal purports to represent Roberta Gove and "the Greniers," the issue of
the standing of the latter parties is not properly before us.

[2] Town of Chatham.

[3] Roberta Gove *vs.* Conservation Commission of Chatham.

The following submitted briefs for amici curiae:

*Gregor I. McGregor* for Massachusetts Association of Conservation Commissions.

*John A. Pike* for Conservation Law Foundation.

*James S. Burling & J. David Breemer*, of California, for Pacific Legal Foundation.

MARSHALL, C.J. Roberta Gove owns "lot 93," an undeveloped parcel of land within a "coastal conservancy district" (conservancy district) in Chatham. In 1998, Ann and Donald J. Grenier agreed to buy lot 93 from Gove, contingent on regulatory approval for the construction of a single-family house on the property. Because Chatham prohibits construction of new residences in the conservancy district, the zoning board of appeals of Chatham (board) denied the Greniers a building permit. Gove and the Greniers sought relief in the Superior Court on statutory and constitutional grounds, contending that the prohibition against residential construction on lot 93 did not substantially further a legitimate State interest and that the board had effected a taking of lot 93, without compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and art. 10 of the Massachusetts Declaration of Rights. After a two-day bench trial, a judge in the Superior Court ruled in favor of the defendants on all counts. The Appeals Court affirmed. *Grenier* v. *Zoning Bd. of Appeals of Chatham*, 62 Mass. App. Ct. 62 (2004).[4] We granted Gove's application for further appellate review, and now affirm the judgment of the Superior Court.[5]

1. *Background.* Lot 93 is located in the Little Beach section of Chatham, nearly all of which was acquired by Gove's parents (the Horne family) in 1926. In time, members of the Horne

---

[4]The Appeals Court concluded, *Grenier* v. *Zoning Bd. of Appeals of Chatham*, 62 Mass. App. Ct. 62, 70 (2004), and we agree, that any argument as to the judge's nonconstitutional rulings failed to satisfy the requirements of Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Gove has not pursued any separate appeal here concerning her claim under art. 10 of the Massachusetts Declaration of Rights, which is deemed waived. See *Tobin* v. *Commissioner of Banks*, 377 Mass. 909, 909-910 (1979).

[5]We acknowledge the amicus briefs filed by Conservation Law Foundation, Massachusetts Association of Conservation Commissions, and Pacific Legal Foundation.

family developed a motel, marina, rental "cottage colonies," and a number of single-family houses in Little Beach. The family also sold several lots for development. In 1975, that portion of Little Beach still owned by the Horne family was divided, by the terms of the will of Gove's mother, among Gove and her three brothers. Gove received several lots outright and sixteen other lots in fractional ownership, to be shared with her brothers. Gove also obtained title to at least two cottages. Gove continues to own one cottage in Little Beach; she sold a second in 1996.

Little Beach is part of a narrow, low-lying peninsula, bounded by Chatham Harbor and Stage Harbor, at the extreme southeastern corner of Cape Cod. In recent years, a "breach" has formed in the barrier island that long separated Chatham Harbor from the open ocean. The breach, which is widening, lies directly across the harbor from Little Beach, and a land surveyor familiar with the area testified that Little Beach is now "wide open to the Atlantic Ocean" and prone to northeasterly storm tides. Chatham is known for its vulnerability to storms, and, according to an expert retained by Gove and the Greniers, in recent years Chatham has "as a direct result of the breach" experienced a "significant erosion problem," including "[h]ouses falling into the sea." The same expert testified that, since the appearance of the breach, "there had been a significant rise in the mean high water [near lot 93] along Chatham Harbor." The record indicates that virtually no development has occurred in Little Beach since 1980.

Even before the breach developed, Little Beach was prone to inundation by seawater. Gove testified that the area was flooded by hurricanes in 1938, 1944, and 1954, and by a significant offshore ocean storm in 1991. None of these storms struck Chatham directly, but in the 1944 hurricane, Stage Harbor experienced a storm surge some nine feet above sea level. The 1954 hurricane damaged buildings and flooded roads in Little Beach. The 1991 storm flooded the area around lot 93 to a depth of between seven and nine feet above sea level, placing most, if not all, of the parcel underwater. The 1944, 1954, and 1991 storms, while significant, were less severe than the

hypothetical "hundred year storm"[6] used for planning purposes, which is projected to flood the area to a depth of ten feet. According to another expert called by Gove and the Greniers, during storms, roads in Little Beach can become so flooded as to be impassable even to emergency vehicles, and access to the area requires "other emergency response methods," such as "[h]elicopters or boats." The same expert conceded that, in an "extreme" event, the area could be flooded for four days, and that, in "more severe events" than a hundred year storm, storm surge flooding in Little Beach would exceed ten feet.

Lot 93 itself consists of approximately 1.8 acres. The lot is within approximately 500 feet of both Stage Harbor and Chatham Harbor and, according to one expert, is susceptible to coastal flooding "from both the front side and the backside of [the] property." The lot is bisected by a tidal creek, which is prone to flooding as well. The highest point on the property is 8.7 feet above sea level, and much of the property is less than four feet above sea level and technically a "wetland." According to a 1998 map issued by the Federal Emergency Management Agency, lot 93 lies entirely within flood hazard "Zone A," an area defined by its vulnerability to "[s]ignificant flooding" in "hundred year storms." Lot 93 also lies immediately outside "Zone V" where, during a hundred year storm, significant flooding with wave action can be expected.

Gove inherited lot 93 in 1975, when residential development was permitted on the parcel. In 1985, however, the town placed all of the land within the hundred year coastal flood plain, including lot 93, into the conservancy district. The stated purposes of the conservancy district include maintaining the ground water supply, protecting coastal areas, protecting public health and safety, reducing the risk to people and property from "extreme high tides and the rising sea level," and conserving natural resources. The town zoning officer testified that the conservancy district serves to mitigate the "total public safety problem" of coastal flooding, and was specifically intended to protect both residents and public safety personnel.

The bylaw governing the conservancy district bars without

---

[6]"A hundred year storm" is, as the term suggests, a statistical approximation of the most severe storm likely to occur in one century.

exception the construction of new residential dwellings. The bylaw does allow specified nonresidential uses, either as of right or by special permit.[7] The zoning officer testified that the nonresidential uses are less likely to create a danger in the event of a flood than are residential structures, in part because structures "ancillary" to homes "tend to break off" in storms and "do a lot of collateral damage to other structures and property," whereas such damage is less likely when nonresidential structures, normally more firmly anchored to the ground, are built.

In the years before the zoning regulations were amended to restrict development in the hundred year flood zone, Gove attempted to sell lot 93.[8] She listed the lot and another she owned with a local broker but "had no offers" on the properties, and she withdrew them from the market. Gove further testified that, whatever its value before the breach developed, lot 93's worth had "plummeted" as a result of the breach and the property "had no value . . . whatsoever" in the early 1990's. By the late 1990's, property in the area had gained value, she said, but the land, she clarified, was still most attractive to those who "have lived in the area" and were unswayed by frequent media reports of storm damage in Chatham.

In 1998, the Greniers contracted to purchase lot 93 from Gove for $192,000, contingent on their ability to obtain permits for a home and a septic system on the site. The Greniers proposed to develop a house on lot 93 on land between 5.3 and 7.0 feet in elevation. They proposed to construct the home raised on pilings, so that the level of the first floor would be

[7] Uses allowed as of right include fishing and harvesting activities, shellfishing, outdoor recreation, the installation of floats, maintenance of roadways, installation of utilities, agricultural activities, dredging for navigational purposes, and construction and maintenance of public boat launches and public beaches. By special permit, additional uses are allowed, including the construction of "catwalks, piers, ramps, stairs, unpaved trails, boathouses, boat shelters, [and] roadside stands"; structures for marinas and boatyards; driveways and roadways; and private boat launching ramps.

[8] It is unclear from the record exactly when Gove first attempted to sell the property. She stated "it was after the 70's. In the early '70's probably." As we have discussed, Gove did not gain title to lot 93 until 1975.

above the level of a hundred year flood.[9]

A zoning officer denied the Greniers a permit to build a house on the property. The board upheld the decision of the zoning officer. Gove and the Greniers then filed one suit against the selectmen and board and another against the conservation commission of Chatham. A Superior Court judge consolidated the actions, and the parties agreed to a bifurcated trial in which all claims, except for the issue of compensation, would first be tried before a judge, with issues of compensation then tried, if necessary, to a jury.

After a two-day trial during which both parties presented expert testimony, the Superior Court judge found "[i]t is undisputed that [lot 93] lies in the flood plain and that its potential flooding would adversely affect the surrounding area." He found insufficient evidence to support Gove's takings claim, and concluded that she and the Greniers had failed to carry their burden of demonstrating that the board's decision was "legally untenable," "an abuse of discretion, or was arbitrary or capricious."

2. *Discussion.* At trial, Gove attempted to prove that the board had effected a taking of lot 93 by subjecting the property to land use regulation in a manner that failed substantially to advance legitimate State interests. *Lopes* v. *Peabody*, 417 Mass. 299, 303-304 (1994) (*Lopes*). See *Nectow* v. *Cambridge*, 277 U.S. 183 (1928) (invalidating irrational application of zoning ordinance). Gove also contended that the town had deprived her of any beneficial use of lot 93, see *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003 (1992) (*Lucas*), and disrupted her reasonable expectation of developing the property. See *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104 (1978) (*Penn Central*).[10] We discuss Gove's theories in turn.

a. *Legitimate State interests.* Relying on *Lopes*, Gove argues

---

[9]Ancillary to the construction of the house, the Greniers proposed building a raised septic system to be covered by a large mound of fill. The conservation commission of Chatham, after two lengthy hearings, twice rejected the Greniers' application to build the septic system.

[10]Aspects of the Appeals Court's opinion may suggest that the tests in *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104 (1978) (*Penn. Central*), are

first that the zoning regulations, as applied to lot 93, failed substantially to advance legitimate State interests. See *Greenfield Country Estates Tenants Ass'n* v. *Deep*, 423 Mass. 81, 86 (1996). *Lopes* followed the Supreme Court's holding in *Agins* v. *Tiburon*, 447 U.S. 255, 260 (1980) (*Agins*), that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate [S]tate interests." See *Lopes*, *supra* at 305. This term, however, the United States Supreme Court reconsidered the validity of the *Agins* "substantially advance[s] [S]tate interests" standard "as a freestanding takings test," and concluded that "this formula prescribes an inquiry in the nature of a due process, not a takings test, and that it has no proper place in our takings jurisprudence." *Lingle* v. *Chevron U.S.A. Inc.*, 125 S. Ct. 2074, 2083 (2005) (*Lingle*).[11]

In practical effect, *Lingle* renders a zoning ordinance valid under the United States Constitution unless its application bears no "reasonable relation to the State's legitimate purpose." *Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117, 125 (1978). See *Lingle*, *supra* at 2085; *id.* at 2087 (Kennedy, J., concurring) (discussing nature of due process review). This highly deferential test neither involves "heightened scrutiny," *id.* at 2085, nor allows a court to question the "wisdom" of an ordinance. *Exxon Corp.* v. *Governor of Maryland*, *supra* at 124. See *Ferguson* v. *Skrupa*, 372 U.S. 726, 730-732 (1963); *Nectow* v. *Cambridge*, *supra* at 188; *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 395 (1926). To the extent that *Lopes* conflicts with *Lingle*, our earlier decision is, of course, overruled.[12]

conflated. See *Grenier* v. *Zoning Bd. of Appeals of Chatham*, 62 Mass. App. Ct. 62, 70 (2004). The tests are separate and distinct, as the Appeals Court itself recognized. See *id.* at 67-68 (distinguishing between "total" regulatory taking and *Penn Central* inquiry).

[11]As the *Lingle* Court explained: "[T]he Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. . . . Conversely, if a government action is found to be impermissible — for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process — that is the end of the inquiry. No amount of compensation can authorize such action" (citations omitted). *Lingle* v. *Chevron U.S.A. Inc.*, 125 S. Ct. 2074, 2084 (2005).

[12]We decided that case solely on Federal constitutional grounds. *Lopes* v. *Peabody*, 417 Mass. 299, 300 n.2 (1994).

In this case, the evidence clearly establishes a reasonable relationship between the prohibition against residential development on lot 93 and legitimate State interests.[13] Gove offered no testimony meaningfully questioning the conservancy district's reasonable relationship to the protection of rescue workers and residents, the effectiveness of the town's resources to respond to natural disasters, and the preservation of neighboring property.[14] Having addressed Gove's due process concerns, we now consider her takings claim.

b. *Takings*. While the takings clause is directed primarily at "direct government appropriation or physical invasion of private property," the Supreme Court has "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster — and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle, supra* at 2081. See *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U.S. 302, 323-324 (2002) ("we do not apply our precedent from the physical takings context to regulatory takings claims"). Not every regulation affecting the value of real property constitutes a taking, for "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change." *Lingle, supra*, quoting *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 413 (1922). A regulation "goes too far" and becomes

---

[13]In addition to evidence of potential danger to rescue workers, an expert for Gove and the Greniers testified that in an especially severe storm, the proposed house "could certainly be picked up off its foundation and floated" away, potentially damaging neighboring homes. There was other evidence on which the judge could base a finding that a house on lot 93 would pose a danger to surrounding structures, including that the stairs required to reach the raised home, "tend to break off" in storms and "do a lot of collateral damage to other structures and property."

[14]Gove points to the testimony of her expert engineer that "nothing man can do (e.g., constructing houses on pilings in a Zone A or building mounded septic systems) will alter the storm water characteristics of an ocean storm." We need not determine whether this evidence meaningfully implicates the "rational relationship" test, because the validity of the regulations as applied to lot 93 is established easily on other grounds. That the Greniers' proposed residential development would have been in compliance with wetlands and State health regulations also does not lessen the legitimacy of the challenged zoning regulation, which serves different purposes.

a "taking" in any case "where government requires an owner
to suffer a permanent physical invasion of her property" or
where it "completely deprive[s] an owner of '*all* economically
beneficial us[e]' of her property" (emphasis in original). *Lingle,
supra,* quoting *Lucas, supra* at 1019. "Outside these two
relatively narrow categories . . . regulatory takings challenges
are governed by the standards set forth in [*Penn Central*]."
*Lingle, supra.*

Gove does not claim that the conservancy district regulations
effected a physical occupation of her property, so we discuss,
first, why Gove has not shown a "total" regulatory taking under
*Lucas, supra* at 1026. We then address why she has not shown
that she is entitled to compensation under *Penn Central, supra.*

i. *"Total" regulatory takings.* In *Lucas, supra* at 1019, the
Supreme Court concluded that a land use regulation that denies
a plaintiff "*all* economically beneficial use of her property,"
constitutes a taking "except to the extent that 'background
principles of nuisance and property law' independently restrict
the owner's intended use of the property" (emphasis in original).
*Lingle, supra* at 2081, citing *Lucas, supra* at 1026-1032. The
plaintiff in *Lucas* had paid $975,000 for two residential lots at a
time when he was "not legally obliged to obtain a permit . . .
in advance of any development activity." *Id.* at 1006, 1008.
Two years later, the State enacted laws that, a State court found,
rendered the two parcels "valueless," *id.* at 1007, leading the
Supreme Court to conclude that a total regulatory taking could
be established. *Id.* at 1031-1032.

In *Palazzolo* v. *Rhode Island,* 533 U.S. 606, 630-631 (2001)
(*Palazzolo*), the Supreme Court further explained that, to prove
a total regulatory taking, a plaintiff must demonstrate that the
challenged regulation leaves "the property 'economically idle' "
and that she retains no more than "a token interest." *Id.* at 631,
quoting *Lucas, supra* at 1019. The plaintiff in *Palazzolo* was
unable to prove a total taking by showing that an eighteen-acre
property appraised for $3,150,000 had been limited, by regula-
tion, to use as a single residence with "$200,000 in develop-
ment value." *Id.* at 616, 631.

Here, the facts are no more indicative of a total taking than
those considered by the Supreme Court in *Palazzolo.* Even if

we limit our analysis to lot 93, Gove has failed to prove that the challenged regulation left her property "economically idle."[15] Her own expert testified that the property was worth $23,000, a value that itself suggests more than a "token interest" in the property. See *Rith Energy, Inc.* v. *United States*, 270 F.3d 1347, 1349 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002) (discussing "token interest"). Moreover, the expert's $23,000 valuation did not take into account uses allowed in the conservancy district, either as of right or by special permit, which she admitted could make the property "an income producing proposition."[16] See note 7, *supra*. The judge's finding that lot 93 retained significant value despite the challenged regulation invalidates Gove's theory: she cannot prove a total taking by proving only that one potential use of her property — i.e., as the site of a house — is prohibited. *Lucas, supra* at 1019, requires that the challenged regulation "denies *all* economically beneficial use" of land. See *Lingle, supra* at 2082

---

[15]There may be good reason to view the impact of the conservancy district regulations on lot 93, in the context of Gove's entire holding in Little Beach, and perhaps even the entire parcel purchased by her parents in 1926. Because we conclude that the facts as applicable solely to lot 93 do not warrant a conclusion that there has been a taking, we need not address the so-called "denominator problem," and we leave the vexing questions there involved for another day, as did the Supreme Court in *Palazzolo* v. *Rhode Island*, 533 U.S. 606, 631-632 (2001) (*Palazzolo*). But see Wright, A New Time for Denominators, 34 Envtl. L. 175 (2004), and sources cited. See also *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U.S. 302, 327, 331-332 (2002) (rejecting theory of "conceptual severance" and concluding "we must focus 'on the parcel as a whole' "); Blume, Compensation for Takings: An Economic Analysis, 72 Cal. L. Rev. 569, 610-611 (1984) (necessary to consider net worth and risk aversion of plaintiff).

[16]Gove's real estate appraiser assessed the value of lot 93 as of the date of the trial at $346,000, "as buildable for a three bedroom dwelling." The appraiser testified that the value of lot 93 as "unbuildable" was $23,000. The appraiser conceded that, used as a marina or boat storage facility, as is a neighboring property, lot 93 could become "an income producing proposition," and that the property also could have value for stabling horses (a use available as of right), but that she had not considered either potential use of the property in arriving at her $23,000 valuation. In addition to this testimony, Ann Grenier testified that homeowners in the vicinity of lot 93 used their property for boat storage. A town zoning officer testified that the town had issued permits for the construction of boat storage buildings on improved and unimproved lots within the conservancy district. Gove and the Greniers presented no evidence that they had ever been denied use of lot 93 for any nonresidential purpose.

(in *Lucas* context "the complete elimination of a property's value is the determinative factor").[17] We now turn to the *Penn Central* inquiry.

ii. *The Penn Central inquiry.* Recent Supreme Court opinions have emphasized that almost all regulatory takings cases involve the "essentially ad hoc factual inquiries" described in *Penn Central, supra* at 124. See *Lingle, supra*; *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency, supra* at 321-326, 335-336 (2002) (temporary moratoria on development); *Palazzolo, supra.*

The *Penn Central* framework eschews any "set formula" or "mathematically precise variables" for evaluating whether a regulatory taking has occurred, emphasizing instead "important guideposts" and "careful examination . . . of all the relevant circumstances." *Palazzolo, supra* at 633, 634, 636 (O'Connor, J., concurring). The relevant "guideposts" include: the actual "economic impact of the regulation" on the plaintiff; the extent to which the regulation "has interfered with" a landowner's "distinct investment-backed expectations"; and the "character of the governmental action." *Lingle, supra* at 2081-2082, quoting *Penn Central, supra* at 124. See *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency, supra* at 320; *Leonard* v. *Brimfield,* 423 Mass. 152, 154, cert. denied, 519 U.S. 1028 (1996). In the end, "the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle, supra* at 2082.

Considering all of the evidence at trial, we agree with the judge that Gove failed to show that the conservancy district

---

[17]Because Gove has failed to prove that the challenged regulation left lot 93 "economically idle," and because she retains far more than a token interest in her property, *Palazzolo, supra* at 631, quoting *Lucas, supra* at 1019, we need not consider whether the house the Greniers had proposed to construct on lot 93 otherwise would have been prohibited by "background principles of nuisance and property law." *Lingle, supra* at 2081, quoting *Lucas, supra* at 1026-1032. *Palazzolo, supra* at 630. *Lucas, supra* at 1029-1031. See *Commonwealth* v. *Alger,* 7 Cush. 53, 84-85 (1853) (Shaw, C.J.) (discussing "reasonable limitations" inherent in titles to land in Massachusetts). See also *Turnpike Realty Co.* v. *Dedham,* 362 Mass. 221, 233 (1972), cert. denied, 409 U.S. 1108 (1973) (discussing "necessity of flood plain zoning").

regulations had a substantial "economic impact" on her or deprived her of "distinct investment-backed expectations" in lot 93. *Lingle, supra* at 2082, quoting *Penn Central, supra* at 124. As an initial matter, Gove's failure to introduce a thorough assessment of lot 93's current value left the judge no basis to conclude that she suffered any economic loss at all. But even if we assume that residential development is the most valuable potential use of lot 93, Gove did not prove that the prohibition against a house on lot 93 caused her a loss outside the range of normal fluctuation in the value of coastal property. See *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency, supra* at 332, quoting *Agins* v. *Tiburon*, 447 U.S. 255, 263 n.9 (1980) ("fluctuations in value . . . are 'incidents of ownership' ").

Lot 93 is a highly marginal parcel of land, exposed to the ravages of nature, that for good reason remained undeveloped for several decades even as more habitable properties in the vicinity were put to various productive uses. Lot 93 is now even more vulnerable than ever to coastal flooding. Nevertheless, recent appreciation in coastal property (belatedly, and for the time being) has given the parcel some development value. Absent the coastal conservancy district regulations, lot 93 might well be worth more. But this is a new — and insofar as it relates to residential development, wholly speculative — value that has arisen after the regulations became effective. Before the enactment of the regulations, Gove had no reasonable expectation of selling the property for residential development, a fact she recognized by removing the property from the market for want of an offer. Nor did Gove have any reasonable expectations of a better outcome as late as the early 1990's, when lot 93 had, by Gove's own estimation, "no value whatsoever." Gove could not have developed reasonable expectations of selling lot 93 for residential development *after* the early 1990's, by which time the regulations had barred any such development for several years. The takings clause was never intended to compensate property owners for property rights they never had. See *Lucas, supra* at 1030 (outside "total" regulatory takings context, "the Takings Clause does not require compensation when an owner is barred from putting land to a use that is

proscribed by . . . 'existing rules or understandings' ''); *Boston Chamber of Commerce* v. *Boston*, 217 U.S. 189, 195 (1910) (Holmes, J.) ("the question is what has the owner lost"); *Leonard* v. *Brimfield, supra* at 155. See also *Palazzolo, supra* at 641-643 (Stevens, J., concurring in part) (takings claim is "determined by the impact of the event that is alleged to have amounted to a taking"). Gove's argument is not furthered by the Greniers' tentative offer to pay $192,000 for the parcel contingent on receiving approval to build a single-family house, a proposition that all parties reasonably should have known was highly dubious at best, particularly since the regulations did not permit such variances. It is similarly fallacious for Gove to claim that the regulations diminished the value of her property from $346,000 (the appraiser's estimate of the value of lot 93 at the time of the trial *if* it were suitable for a three-bedroom home) to $23,000 (the appraiser's estimate of the land's "un-buildable" worth).

This is not a case where a bona fide purchaser for value invested reasonably in land fit for development, only to see a novel regulation destroy the value of her investment. Gove did not purchase lot 93; she inherited the property as part of the devise from her mother in which she received other real property of significant value. See note 15, *supra.* By this we do not suggest that Gove's takings claim is defeated simply on account of her lack of a personal financial investment. See *Palazzolo, supra* at 634-635 (O'Connor, J., concurring) ("We . . . have never held that a takings claim is defeated simply on account of the lack of a personal financial investment by a . . . donee, heir, or devisee"). Rather, Gove's failure to show any substantial "personal financial investment" in lot 93 emphasizes her inability to demonstrate that she ever had any *reasonable* expectation of selling that particular lot for residential development, or that she has suffered any substantial loss as a result of the regulations. In these circumstances "justice and fairness" do not require that Gove be compensated. *Penn Central, supra* at 124, quoting *Goldblatt* v. *Hempstead*, 369 U.S. 590, 594 (1962). To the contrary, it seems clear that any compensation would constitute a "windfall" for Gove. See *Palazzolo, supra* at 635-636 (O'Connor, J., concurring) (discussing nature of test for "reasonableness" of property owner's expectations).

We add that "the character of the governmental action" here, *Lingle, supra* at 2082, quoting *Penn Central, supra* at 124, is the type of limited protection against harmful private land use that routinely has withstood allegations of regulatory takings. It is not at all clear that Gove has "legitimate property interests" in building a house on lot 93. *Lingle, supra.* The judge found that "it is undisputed that [lot 93] lies in the flood plain and that its potential flooding would adversely affect the surrounding areas" if the property were developed with a house.[18] Reasonable government action mitigating such harm, at the very least when it does not involve a "total" regulatory taking or a physical invasion, typically does not require compensation. See *Agins* v. *Tiburon*, 447 U.S. 255, 261 (1980) (regulation reducing "ill effects of urbanization"); *Penn Central, supra* at 138 (regulation restricting alteration of historic landmarks); *Goldblatt* v. *Hempstead, supra* (regulation restricting extent of excavation below ground water level); *Miller* v. *Schoene*, 276 U.S. 272 (1928) (statute requiring landowner to destroy disease-harboring trees).

*Judgment affirmed.*

---

[18]Gove disputes the import of the judge's finding by pointing to one sentence where he states that construction of a single residence in the applicable zone "would not pose a serious problem because, by definition, [the zone] does not have any wave action." But the judge's findings, read as a whole, make clear that construction of a house on lot 93 would indeed pose a danger to neighboring landowners. We reject Gove's contention that, by including one sentence in his ruling referring specifically to the problem of wave action, the judge meaningfully questioned the efficacy of the coastal conservancy district regulations, as applied to lot 93, in mitigating damage from coastal flooding not driven by waves.