# MaryAnn Doherty *vs.* Planning Board of Scituate.

Suffolk. December 3, 2013. - March 21, 2014.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Zoning,* Flood plain, Littoral property, By-law, Special permit. *Planning Board. Municipal Corporations,* Planning board, By-laws and ordinances. *Words,* "Subject to flooding."

Discussion of the standard of review applicable to a town zoning board's denial of a special permit. [566-567]
In a civil action brought in the Land Court by the owner of two adjacent, unimproved lots located in a flood plain and watershed protection district, challenging the denial by the defendant town planning board (board) of her application for special permits to construct new residential dwellings on the lots, the judge correctly dismissed the complaint on the ground that the owner failed to demonstrate that the lots were "in fact not subject to flooding" within the meaning of the applicable town bylaw (a phrase not defined in that bylaw), where the purposes of the bylaw did not reflect a restricted concept of flooding based solely on elevation, and where a broad meaning of flooding as encompassing all varieties of water rising and overflowing on normally dry land was consistent with three of the stated purposes of the bylaw, namely, to protect the health and safety of persons against those hazards that may result from unsuitable development in areas subject to flooding, to conserve the values of lands and buildings in such flood-prone areas, and to encourage the most appropriate and suitable use of the land, as well as with the recognized public policy concerns prompting flood plain zoning regulation [567-570]; where the judge correctly reasoned that the board, in determining whether the lots were subject to flooding, could consider testimony of witnesses describing their observations of water on the lots as well as the presence of Federal flood zones that describe expected occurrences (albeit infrequent) of floodwater and wave action on the lots [570-571]; where another provision of the bylaw did not make plain that elevation was to be determinative, nor did prior case law of this court require a contrary result [571-572]; and where the standard to be applied by the board was not subject to attack for vagueness [572].

CIVIL ACTION commenced in the Land Court Department on August 5, 2008.

The case was heard by *Harry M. Grossman*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Brandon H. Moss* for the defendant.

*Leonard M. Singer (Michael D. Bliss* with him) for the plaintiff.

IRELAND, C.J. The plaintiff, MaryAnn Doherty, owner of two adjacent unimproved lots on a barrier beach peninsula in the town of Scituate (town),[1] applied for special permits from the town's planning board (board) to construct new residential dwellings on the lots, which are located in a flood plain and watershed protection district (FPWP district). The board denied the applications, concluding that Doherty had not demonstrated that her lots were "not subject to flooding" within the meaning of § 470.9 of the zoning bylaw. Doherty sought review pursuant to G. L. c. 40A, § 17; after a bench trial, a Land Court judge entered judgment affirming the board's decision and dismissing Doherty's complaint. In an unpublished order and memorandum pursuant to its rule 1:28, the Appeals Court reversed, concluding that the phrase "subject to flooding" has a specific meaning derived from a map setting forth the FPWP district and based only on elevation from sea level. We granted the board's application for further appellate review. Because we conclude that the Appeals Court adopted an incorrect definition of the phrase "subject to flooding," and we agree with the meaning adopted by the Land Court judge, we affirm the judgment entered by him.

1. *Background.* The judge found the following facts, which we occasionally supplement with undisputed facts in the record. See *Wendy's Old Fashioned Hamburgers of N.Y., Inc.* v. *Board of Appeal of Billerica,* 454 Mass. 374, 383 (2009) (*Wendy's*) (on appellate review, judge's factual findings will not be set aside unless clearly erroneous or where there is no evidence to support them). The unimproved lots in question are located at 114 and 118 Edward Foster Road, in the town's A-3 residential district. The lots consist of approximately 21,600 and 20,950 square feet in area. They are located on a barrier beach peninsula. The easterly side of the peninsula is bounded by the Massachusetts Bay, and the westerly, or landward side, is bounded by Scituate Harbor. On either end of the peninsula, in a north-

---

[1]The plaintiff, MaryAnn Doherty, owns one lot in its entirety and the other in part with a contractual right to acquire the remainder. For purposes of this opinion, we refer to her as the owner of both lots.

south direction, are the geographic areas known as First Cliff and Second Cliff. The two lots lie on a strip of land between and connecting these cliffs.

On the ocean side of Edward Foster Road (facing Massachusetts Bay), a concrete seawall abuts the residential homes between the First Cliff and Second Cliff. The height of the seawall stands consistently at 19.4 feet, with the exception of the seawall abutting both of Doherty's lots. That portion of the seawall, in the main, stands only 16.5 feet high.[2] The single-family dwellings proposed by the plaintiff[3] would comply with all setback and other dimensional requirements, and would be constructed on pilings. The land under the footprints of the dwellings ranges in elevation from fourteen to sixteen feet above sea level.

The local building inspector determined that the lots were located in the FPWP district and that, as a consequence, the plaintiff needed to obtain special permits from the board authorizing construction of new residential dwellings on the lots. The FPWP district is an "overlay" zoning district that was established in 1972.[4] At that time, the local conservation commission retained the services of Vincent John Kalishes, III (Kalishes), and Bill Richardson (Richardson) to create the FPWP district, which was intended "to protect the town's coastal resources and watersheds." Kalishes and Richardson were to do "research to establish where those areas [flood plains and watersheds] are and to identify them and then to come up with some type of mapping system that could be reproduced on the ground by a surveyor or engineer." According to Kalishes, "the scope of the available data at that time was limited, but we got together what we could from the National Weather service and local knowledge and . . . we had meetings in the neighborhoods to get information about where certain lands might be and what had been

---

[2]The discrepancy in height arose from the financial inability of the plaintiff to pay for the cost of raising the height of the seawall following the "Blizzard of 1978."

[3]The plaintiff proposed to construct one four-bedroom home on each lot.

[4]An "overlay" district imposes a regulatory scheme on top of an underlying, existing district, often for the purpose of further regulating or restricting certain permitted uses, or to protect a significant resource. See *KCI Mgt., Inc.* v. *Board of Appeal of Boston*, 54 Mass. App. Ct. 254, 259 (2002); *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 351 & n.5 (2001).

impacted." Thereafter, they developed a map that showed these flood areas.[5]

The map that was created is entitled, "Town of Scituate, Massachusetts, Flood Plain and Watershed Protection District, 1972" (map). Section 470.3 of the zoning bylaw provides that "[t]he locations and boundaries of the [FPWP district] shall be as shown on [the map] . . . [and are] made a part of this zoning bylaw." On the map, the boundaries of the district are indicated by thick dashed lines. Along the dashed lines are references, such as "10 foot contour"[6] and "50 feet behind sea wall." The dashed lines do not follow lot lines, but instead follow natural profiles of the land and other permanent boundaries. The "[m]ap shows the boundary of the [FPWP district] encircling the areas of First and Second Cliff at an elevation of ten feet, placing the encircled area *outside* the [d]istrict, while placing the remainder of the barrier beach peninsula [and the lots] within the [d]istrict."[7]

The map was intended to be relevant only for determining the location of the FPWP district.[8] The construction of a new residential dwelling on land located in the FPWP district is prohibited unless a special permit is obtained. To obtain a special permit, § 470.9 of the zoning bylaw requires an applicant to demonstrate that the land on which the construction is proposed is "in fact not subject to flooding."[9]

In April, 2008, the plaintiff applied to the board for the special

---

[5]The judge found that, in the early 1970s, the concept of flooding was limited to "surge flooding," or flooding that occurs when there is a low barometric pressure over the ocean, which in turn causes a bulge or surge in the water where the sea meets the land. The occurrence of this type of flooding is ascertained in terms of land elevation from sea level.

[6]The map indicates that contours are measured from sea level.

[7]According to Kalishes, the land *between* First Cliff and Second Cliff, namely, the barrier beach peninsula on which the lots are located, was intentionally included in the FPWP district even though portions of land on those lots rise in elevations greater than ten feet.

[8]The "key purpose" of the map was "to give the individual due notice that he may be in a flood zone, and he may have to go through some process to obtain a building permit or to find out that he couldn't obtain a building permit."

[9]Section 470.9 of the zoning bylaw provides:

> "If any land in the [FPWP district] is proven to the satisfaction of the planning board . . . as being in fact not subject to flooding . . . for

permits. The board conducted three days of public hearings. At the hearings, several neighborhood residents described flooding conditions on the lots during various storms, including the "Blizzard of 1978" and "the October 1991 Nor'easter." Also mentioned was the existence of the Federal Emergency Management Agency's (FEMA) flood zones and there was discussion regarding "whether information from FEMA should be used in the decision making process." In its decision, the board noted that a majority of its members "agreed [that] a substantial amount of water would be present on the site during flood events." The board denied the plaintiff's application, concluding that the sites "do not meet the criteria for Section 470.9," i.e., the plaintiff had not established that the lots were "in fact not subject to flooding" within the meaning of § 470.9.

Affirming the board's decision, the Land Court judge heard evidence from neighbors, which he credited, concerning their observations of flooding conditions on the lots,[10,11] and heard expert testimony from both parties concerning the location of the lots in FEMA flood zones. The judge found that FEMA's knowledge of flooding today is based on greater technological and scientific advancements than were available in the early 1970s. Based on these advances, FEMA has recognized and defined three flood zones: a velocity zone, an overwash zone, and an "AE" zone.[12] Each of these flood zones is present on both lots in varying degrees such that, in the event of a "hundred

---

any use otherwise permitted under the applicable provisions of the zoning bylaw, but not specifically listed under Section 400, the planning board may issue a special permit for the proposed use. Such use shall be consistent with all other applicable local bylaws and [S]tate regulations and shall not interfere with the purposes of the [FPWP district] or pose a threat to the public health, safety or welfare."

[10]One neighbor, for example, testified that, during the "October 1991 Nor'easter," "tremendous waves" crossed the lots and flooding overtook the road and was so deep that no one could drive through it. This neighbor recalled that during that storm, and storm conditions generally, ocean water travels over the seawall and floods Edward Foster Road. Another neighbor recounted that, after the "Blizzard of 1978," water completely washed over the lots for three days, leaving over five feet of wet sand covering the road. She testified that the lots flood "roughly three times a year, almost every year."

[11]The plaintiff acknowledged that during some storms she saw water from the Massachusetts Bay flow across the lots.

[12]During a "hundred year storm," which is a storm that has a one per cent

year storm," see note 12, *supra*, significant flooding with wave action consisting of waves at least less than three feet in height, can be expected on the lots.[13] The FEMA flood zones, however, postdate the creation of the map.

As relevant here, the judge noted that the zoning bylaw does not define the phrase "subject to flooding." The judge looked to the ordinary meaning of the phrase as defined in a dictionary in circulation at the time, Webster's Seventh New Collegiate Dictionary (1967), as well as the stated purposes of the bylaw. He concluded that the phrase is "broad, and encompasses all varieties of water rising and overflowing on normally dry land." The judge reasoned that, to limit the meaning of the phrase to either solely elevation or surge flooding, as flooding was understood in the 1970s when the FPWP district was established, would frustrate the stated purpose of the district of protecting "the health and safety of persons against those hazards which may result from unsuitable development . . . in areas subject to flooding." Therefore, the judge determined that the board permissibly could "import the latest science and technology of flooding[] into its construction of the [b]ylaw" and "was not precluded from relying upon the witness testimony that it did, or the presence of FEMA [f]lood [z]ones, to establish that the . . . lots are subject to flooding." The judge went on to determine that the lots are indeed "subject to flooding" within the meaning of the bylaw, and that the board's decision "was in no way arbitrary, capricious or whimsical, nor was it legally untenable."

Doherty appealed. In an unpublished order and memorandum pursuant to its rule 1:28, the Appeals Court reversed, concluding that "the board erred in relying on FEMA flood mapping, a standard not permitted by the by-law; thus, the board's denial

chance of occurring per year, an area on the lots in a "velocity zone" is expected "to experience flooding from Massachusetts Bay up to an elevation of twenty feet with waves greater than three feet in height." On the lots in the overwash zone, or the "transitional zone from the [velocity zone] where the momentum of the water continues," "at least two feet of water flowing over that area" is expected. On the lots in the "AE" zone, "waves, less than three feet in height, will flow up to ground elevation of eleven feet."

[13]Flood water is expected to come from both the Massachusetts Bay and Scituate Harbor.

was based on a legally untenable ground." The Appeals Court determined that the map alone identifies and defines the land that is "subject to flooding," and that the phrase "subject to flooding" encompasses only the meaning that existed in 1972 when the bylaw was amended to establish the FPWP district. That meaning involved a concept of flooding that was predicated solely on elevation. In support of its conclusion, the Appeals Court cited *Turnpike Realty Co.* v. *Dedham*, 362 Mass. 221 (1972), cert. denied, 409 U.S. 1108 (1973) (*Turnpike Realty*), for the proposition that the meaning of the phrase "subject to flooding" in the zoning bylaw "is found in the 1972 map." The Appeals Court went on to conclude that the board wrongfully denied the special permits.

2. *Standard of review.* "Judicial review of a local zoning board's denial of a special permit involves a combination of de novo and deferential analyses." *Shirley Wayside Ltd. Partnership* v. *Board of Appeals of Shirley*, 461 Mass. 469, 474 (2012) (*Shirley Wayside*), citing *Wendy's,* 454 Mass. at 381. "The trial judge makes his own findings of facts and need not give weight to those the board has found." *Shirley Wayside, supra.* See G. L. c. 40A, § 17. "The judge then 'determines the content and meaning of statutes and by-laws and . . . decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or to deny the variance or special permit application.' " *Shirley Wayside, supra,* quoting *Britton* v. *Zoning Bd. of Appeals of Gloucester*, 59 Mass. App. Ct. 68, 73 (2003). "We accord deference to a local board's reasonable interpretation of its own zoning bylaw . . . with the caveat that an 'incorrect interpretation of a statute . . . is not entitled to deference (citations omitted).' " *Shirley Wayside, supra* at 475, quoting *Atlanticare Med. Ctr.* v. *Commissioner of the Div. of Med. Assistance*, 439 Mass. 1, 6 (2003).

"After determining the facts and clarifying the appropriate legal standards, the judge determines whether the board has applied those standards in an 'unreasonable, whimsical, capricious or arbitrary' manner." *Shirley Wayside, supra,* quoting *Wendy's,* 454 Mass. at 382. "This stage of judicial review 'involves a highly deferential bow to local control over community planning.' " *Shirley Wayside, supra,* quoting *Wendy's, supra.* "The

board is entitled to deny a permit even 'if the facts found by the court would support its issuance.' " *Shirley Wayside, supra,* quoting *Wendy's, supra* at 383. "The judge nonetheless should overturn a board's decision when 'no rational view of the facts the court has found supports the board's conclusion.' " *Shirley Wayside, supra,* quoting *Wendy's, supra.* On appellate review, "[w]e review the judge's determinations of law, including interpretations of zoning bylaws, de novo." *Shirley Wayside, supra.* The traditional canons of statutory construction apply to zoning bylaws. *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham,* 382 Mass. 283, 290 (1981).

3. *Discussion.* As an initial matter, a municipality may validly use its zoning power to restrict development in areas that are prone to flooding. See *Turnpike Realty,* 362 Mass. at 227-228. "[T]hree basic public policy objectives of restricting use of flood plains have been advanced: (1) the protection of individuals who might choose, despite the flood dangers, to develop or occupy land on a flood plain; (2) the protection of other landowners from damages resulting from the development of a flood plain and the consequent obstruction of the flood flow; [and] (3) the protection of the entire community from individual choices of land use which require subsequent public expenditures for public works and disaster relief." *Id.* at 228-229, citing Dunham, Flood Control Via the Police Power, 107 U. Pa. L. Rev. 1098, 1110-1117 (1959). Consistent with these public policy objectives, the stated purposes of the FPWP district bylaw permissibly include: "protect[ing] the health and safety of persons against those hazards which may result from unsuitable development in . . . areas subject to flooding," "conserv[ing] the values of lands and buildings in such flood-prone areas," and "encourag[ing] the most appropriate and suitable use of the land."

Pursuant to the bylaw in this case, once land is determined to be located in the FPWP district, as the lots are here, the construction of new residential dwellings requires a special permit pursuant to § 470.9, which in turn requires the applicant to establish that the land is "in fact not subject to flooding." The phrase, "subject to flooding," is not defined in the zoning bylaw. As recognized by the parties, the case turns on the meaning of this phrase.

The plaintiff argued, and the Appeals Court agreed, that the meaning of the phrase, "subject to flooding," is "apparent" from the bylaw, which adopts the map, which in turn employs elevation as solely determinative of flooding. Although the by-law does expressly incorporate and adopt the map, and although the map uses various contours as some of its boundaries, we conclude that the map does not define "subject to flooding" as meaning only whether land is above or below a certain elevation.

First, a close examination of the map shows that it does not exclusively use contours as district boundaries. The map also marks boundaries using designations such as "50 Feet Behind Wall," "E Jericho Road," "Westerly Edge RR Bed," "South of Curb," various distances from "Brook," and "100 Ft. Edge of Pond." To the extent that the map uses contours as boundaries in some instances, it is by no means in all instances and, more importantly, not on the land on which the lots lie.[14] Further, where the map does employ contours as boundaries, it does not do so based on a uniform elevation. For example, in addition to setting forth various "10 foot contour[s]," the map has boundary designations of "12 foot contour," "15 foot contour," and "Mean sea level." The map, on its face, does not look to elevation or to one elevation as solely determinative of whether land is "subject to flooding."[15]

Significantly, to limit the phrase, "subject to flooding," to the

[14]There is no dispute before us concerning whether the lots are located within the FPWP district. The judge's finding on the issue is supported by the evidence. The ten-foot contour line on First Cliff and Second Cliff is relevant only to the property encircled on First Cliff and Second Cliff (signifying that those lands within the circles are exempted from the FPWP district). The land outside of those contour lines, including the lots, is included in the FPWP district. Kalishes testified that the lots were intentionally included in the FPWP district and that, on the land comprising the barrier beach peninsula on which the lots were located, "there would be land that's higher or above or below [and] that's why you go to the permitting authority to determine whether you[r] lots flood or not."

[15]The plaintiff contends that the "variant boundary designations" on the map, or designations that differ from a ten-foot contour boundary, are not relevant because they are located in noncoastal areas and regarding those in coastal areas, they "are either proxies for the [ten-foot contour] or are accommodations to political or commercial realities." Although the plaintiff has provided some evidence to support this contention, it does not, however, change the fact that a ten-foot contour line was not uniformly used on the map or the fact that the lots are located in the FPWP district.

map boundaries (whatever elevation or designation they may be) would render § 470.9 of the bylaw impermissibly super-fluous. See *Adamowicz* v. *Ipswich*, 395 Mass. 757, 760 (1985) (statute should not be construed "so as to render it or any por-tion of it meaningless"). This is so because if the boundary designation were the sole criteria in determining whether land is "subject to flooding," then no special permit procedure would be needed to show that land on a particular lot is "in fact not subject to flooding."

The judge correctly looked to the plain and ordinary meaning of the term "flood" as used in the phrase "subject to flooding" and correctly determined that "flooding" is a broad term. "When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose." *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977). "We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Id.* The judge consulted such a source, a Webster's Dictionary in circulation at the time the FPWP dis-trict was created, Webster's Seventh New Collegiate Dictionary (1967), which defined "flood" as "a rising and overflowing of water especially onto normally dry land."[16] Also, prior to 1972, other accepted definitions of the term "flooding" did not restrict the meaning of the term to elevation only. See, e.g., *Long Mo-tor Lines, Inc.* v. *Home Fire & Marine Ins. Co.*, 67 S.E.2d 512, 515 (S.C. 1951) (noting that "flood" is defined in Black's Law Dictionary [3d ed.] as "inundation of water over land not usu-ally covered by it" and in another text as "a body of water ris-ing, swelling, and overflowing land not usually covered with water").

A broad meaning of the phrase, "subject to flooding," en-compassing, as the judge explained, "all varieties of water ris-ing and overflowing on normally dry land," is consistent with three of the stated purposes of the bylaw, namely, "[t]o protect the health and safety of persons against those hazards which

---

[16]The definition is similar to more current definitions. See, e.g., Webster's Third New International Dictionary 873 (1993) (defining "flood" as "a rising and overflowing of a body of water that covers land not usually under water").

may result from unsuitable development . . . in areas subject to flooding," "[t]o conserve the values of lands and buildings in such flood-prone areas," and "[t]o encourage the most appropriate and suitable use of the land," as well as with the recognized public policy concerns prompting flood plain zoning regulation. See *Gove* v. *Zoning Bd. of Appeals of Chatham*, 444 Mass. 754, 757, 761 (2005); *Turnpike Realty*, 362 Mass. at 228-229. The public safety issues relative to "the damage to life and property caused by flooding," *Turnpike Realty*, *supra* at 233, are the concerns, not an artificial modifier focused on elevation. Thus, the purposes of the bylaw do not reflect a restricted concept of flooding based solely on elevation.

Further, the judge correctly reasoned that the board could, in determining whether the lots were "subject to flooding," consider testimony of witnesses describing their observations of water on the lots[17] as well as the presence of FEMA flood zones which describe expected occurrences, albeit infrequent, of floodwater and wave action on the lots. This conclusion is informed by the inclusion of the phrase, "as being in fact," that precedes the phrase "subject to flooding." The phrase "in fact" means "in truth: actually, really," "an actual happening in time or space." Webster's Third New International Dictionary 813 (1993). See *id.* at 873 (defining "flood" as "a rising and overflowing of a body of water that covers land not usually under water"). Thus, by its express terms, "in fact not subject to flooding" status permits consideration of evidence of the actual occurrences of flooding on the lots. See *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. at 290 ("Specific provisions of a zoning enactment are to be read in the context of the law as a whole, giving the language its common and approved meaning . . ."). The words "as being in fact" cannot be ignored and are not superfluous.[18] Also significant to us is § 470.1 of

---

[17]Indeed, in preparing the map, Kalishes did not limit the concept of flooding to elevation only. Elevation was a factor, but Kalishes also relied, in part, on the observations of others in determining whether land was "subject to flooding." As the Land Court judge noted, "[i]t is unlikely that the residents interviewed [as part of preparing the map] understood or were aware of the distinction between surge flooding and other observable instances of water flowing onto normally dry land, when they reported their observations."

[18]Our construction does not compel a conclusion in a future case that a

the bylaw, which sets forth the purposes of the bylaw. It is noteworthy that the first purpose speaks to "areas subject to flooding," followed by, in the next purpose, the phrase "in such flood-prone areas." The use of this language suggests that land "subject to flooding" is to be synonymous with "flood-prone areas," which also is a broad phrase that was not further defined or restricted under the bylaw. See *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham, supra.*

The provision in § 470.10 of the bylaw does not, as the plaintiff contends, "make[] plain that elevation is to be determinative." A complete reading of this section provides:

> "Whenever an application is made for a building permit on land which the building commissioner[] believes may involve the use of land in the [FPWP district], he or she may require the applicant for such permit to provide as part of such application a plan of the lot on which said building[] is intended to be built, showing elevations of the land contours at one foot intervals, referred mean sea level datum and certified by a registered land surveyor."

When read in its entirety, the import of this section is to determine whether certain land indeed falls within the district. Here, there is no dispute that the lots are located in the district. If (or once) the land is determined to fall within the district, § 470.9 applies, requiring a special permit.

Our decision in *Turnpike Realty* does not require a contrary result. In *Turnpike Realty,* we upheld a bylaw regulating filling and building in a flood plain district. *Turnpike Realty,* 362 Mass. at 229. We examined a special permit procedure in the bylaw in that case (a procedure nearly identical to the one in this case) that established a special permit procedure relating to land "not subject to flooding or not unsuitable because of drainage conditions." *Id.* at 230-231. We stated that the purpose of such a provision was "to prevent injustice resulting from the establishment of zoning districts based on 'the physical char-

---

mere puddle on land after a storm is indicative that the land is "subject to flooding." Local boards and courts should "not abandon reason and common sense" in construing a bylaw. *DeMello* v. *Board of Appeals of Acushnet,* 21 Mass. App. Ct. 974, 975 (1986).

acteristics of substantial areas.' " *Id.* at 231, quoting *Leahy* v. *Inspector of Bldgs. of New Bedford*, 308 Mass. 128, 132 (1941). We set forth an example where a landowner might apply for a special permit pursuant to this provision, i.e., where the landowner could establish that portions of his land, namely, two knolls, "one of 3.2 acres and the other of .2 acres," within the district "[rose] above the general level of the swamp" and were "not subject to flooding." *Turnpike Realty, supra* at 223, 230-231. We made clear, however, that elevation alone, or even an inadvertent inclusion of the property in the flood plain district, did not obviate the need for the landowner to apply for a special permit. *Id.* at 231, 237. The *Turnpike Realty* case does not, as suggested by the Appeals Court, stand for the proposition that a property owner can circumvent the procedures and requirements of the bylaw and rely only on the content of a map and a contour boundary therein to determine whether certain property, regardless of its area and the portion of that area rising above the flood plain, is "subject to flooding." Further, nothing in the *Turnpike Realty* case addresses the types of evidence that may be considered to determine whether land is "subject to flooding."

Our conclusion does not render the bylaw impermissibly vague. "It is true, of course, that a zoning ordinance or by-law may not be cast in such vague terms that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Fogelman* v. *Chatham*, 15 Mass. App. Ct. 585, 588 (1983), citing *O'Connell* v. *Brockton Bd. of Appeals*, 344 Mass. 208, 212 (1962). "But this does not mean that the application of the zoning ordinance or by-law may not validly call for the exercise of judgment . . . or require findings of fact to determine whether particular land falls within the regulatory framework established by the ordinance or by-law" (citations omitted). *Fogelman* v. *Chatham, supra* at 588-589. The standard to be applied by the board in this case — that the land is "in fact not subject to flooding," considered together with the general purposes of the FPWP district and the public policy concerns of development in flood plains, and the existence of judicial review — has been determined to be precise. *Turnpike Realty*, 362 Mass. at 231-232. The standard is not subject to attack for vagueness.

We briefly address some of the plaintiff's remaining arguments.

We are not bound by a model bylaw that was consulted when drafting the bylaw, rather, we are to construe the language of the bylaw at issue. Nor are we bound or estopped by former decisions of the board regarding unrelated property. See *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. 205, 224 (1982) (doctrine of estoppel not applicable to municipalities); *Petrillo* v. *Zoning Bd. of Appeals of Cohasset,* 65 Mass. App. Ct. 453, 456 n.9 (2006) (local zoning decisions do not necessarily qualify as final determinations for issue or claim preclusive effect because of various provisions of Zoning Act that bear on finality). Further amendments to the bylaw were not necessary to convey the meaning of "subject to flooding" because the plain and ordinary meaning of the phrase is broad and unrestrictive.

Last, the plaintiff's contention that the board and judge applied the standard — whether the land is "subject to flooding" — in an unreasonable manner is based only on an argument that the standard involves elevation only as noted on the map. Because we reject that argument, the plaintiff's contention similarly fails. We point out, however, that our review of the record shows that the board did not apply the standard at issue in an "unreasonable, whimsical, capricious or arbitrary" manner. See *Shirley Wayside, supra* at 475, quoting *Wendy's, supra* at 382.

*Judgment affirmed.*