APPEALS COURT 
 
 SUNPIN ENERGY SERVICES, LLC, & another[1] vs. ZONING BOARD OF APPEALS OF PETERSHAM

 
 Docket:
 24-P-18
 
 
 Dates:
 January 14, 2025. – July 9, 2025
 
 
 Present:
 Vuono, Hershfang, & Tan, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Public Utilities, Energy company, Electric company, Electrical transmission line, Sale of electric power. Electric Company. Electricity. Renewable Energy. Zoning, Special permit, Permitted use, By-law. Practice, Civil, Summary judgment.
 
 

             Civil action commenced in the Land Court Department on December 17, 2021. 
            The case was heard by Jennifer S.D. Roberts, J., on motions for summary judgment. 
            James F. Martin for the plaintiffs.
            David J. Doneski for the defendant.
            Thaddeus Heuer, Zachary Gerson, & Kevin Chen, for Solar Energy Industries Association & another, amici curiae, submitted a brief.
            VUONO, J.  This case pits two laudable environmental goals against one another:  the promotion of alternative renewable energy and the need to preserve forests to promote natural ecosystems.  The plaintiffs, Sunpin Energy Services, LLC (Sunpin), a California limited liability company, and Ralph P. Lapinkas, Jr., seek to build and operate a large-scale ground-mounted solar energy system (project) on rural private property owned by Lapinkas in Petersham (town).  The purpose of the project is to create electricity for sale directly to National Grid for distribution to its customers.  Installation of the project will entail extensive clearing of vegetation and trees on approximately fourteen acres of a twenty-four-acre parcel.  Due to the location of the project, Sunpin was required to obtain a special permit and site plan review from the zoning board of appeals (board), the town's special permitting authority.  Because the board has three members, a unanimous vote is required to grant a special permit.  See G. L. c. 40A, § 9.  Two members voted in favor of granting Sunpin's special permit application, and one voted against it; therefore, the application was denied.
            The plaintiffs then commenced this action in the Land Court, challenging the board's decision by filing a complaint pursuant to G. L. c. 40A, § 17.  As we discuss in more detail later, the dissenting board member acknowledged that the proposed project is not prohibited by statute or the town's zoning bylaw (bylaw), but she nonetheless voted against granting a special permit because, among other reasons, she determined that the development of the solar energy system involving extensive tree removal was incompatible with the "general welfare of the inhabitants of [the town]," and the State's diversified energy policy, which "strongly discourages" siting such projects in a forest.  On cross motions for summary judgment, the judge concluded that the dissenting member properly relied on the standards articulated in the bylaw and that this case was not one of "those rarely encountered points where no rational view of the facts . . . supports the board's conclusion," quoting Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 383 (2009) (Wendy's).  Accordingly, the judge granted summary judgment in favor of the board.
            We reach a different conclusion.  Where, as here (and as the two other board members found), the Legislature has protected the proposed use pursuant to G. L. c. 40A, § 3, ninth par.; the proposed use is allowed within the town with a special permit; the project as described in the application complies with all relevant local zoning requirements, including those specifically adopted to address tree removal for solar electric installations;[2] and the town has not adopted any regulations prohibiting projects that require tree removal, the board's decision exceeded its "discretionary power of denial."  Wendy's, 454 Mass. at 383, quoting Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68, 74 (2003).  The denial of the application in the circumstances presented here was contrary to the legislative goal of promoting solar energy and rested primarily on the subjective beliefs of one board member.  We therefore vacate the judgment entered in the board's favor.[3]
            Background.  The following facts are undisputed.[4]  The entire town is zoned residential-agricultural.  The town has established a solar electric overlay district (SEOD) that allows for "large-scale ground-mounted solar electric installation[s] (greater than 10 kW [kilowatts])" as of right.  However, any such installations located outside the SEOD require a special permit in accordance with §§ 11.2 and 18 of the bylaw.[5]  The proposed site of the project is on property located outside of the SEOD, thereby requiring a special permit and site plan review.
            As previously noted, the proposed project site is on land owned by Lapinkas.  The property consists of undeveloped forest and wetlands and has frontage along New Athol Road.  There are five direct abutters to the property, including privately owned undeveloped land, two residential lots, and the Riceville Pond site of the Harvard Forest,[6] where public access is allowed for recreation, including hiking, dog walking, fishing, and hunting.
            The project is a 4.3-megawatt (direct current) photovoltaic generation and 2.0-megawatt energy storage system and requires the construction of a ground-mounted solar array and battery racks.  The solar panels will be mounted on a simple fixed-tilt, post, rail, and cross beam racking system.  The entire solar array, approximately 12,090 solar photovoltaic panels and related equipment, will be enclosed with a seven-foot high chain link fence and a locking gate.  The property consists of approximately twenty-four acres, and the majority of the site is wooded; trees that shade the 14.3-acre portion of the property where the array will be located will be cleared in order to reduce shade and maximize the energy output of the system.  Prior to the final submission of its application and site plan to the board, Sunpin obtained an order of conditions from the town conservation commission under the Wetlands Protection Act, allowing the project to proceed.  See G. L. c. 131, § 40.
            A public hearing on Sunpin's application and site plan was held on June 3, 2021, and continued on July 22, 2021, August 19, 2021, and September 23, 2021, at which time the public hearing was closed.  Thereafter, two board members voted to approve the application and grant a special permit subject to certain conditions and safeguards, including the maintenance of vegetative screening to provide a natural visual buffer and noise barrier to the abutting residential properties.
            The dissenting board member, Maryanne Reynolds, submitted a statement of reasons (statement) in which she set forth opposing findings and provided a detailed explanation for her vote.  In her statement, which was incorporated into the board's decision, Reynolds stated that "Petersham is a town that prioritizes natural and working lands.  There is a deep and enduring ethos among the inhabitants to conserve, create, restore and employ the natural resources within the town."  Reynolds acknowledged that the project satisfied the requirements of the site plan review but concluded that the requirements for a special permit were not satisfied primarily because "[t]he project is 'strongly discouraged' under applicable state [energy] policy . . . ."
            The board contends that the "State policy" on which Reynolds relied is set forth in two documents:  (1) the Clean Energy Results Questions & Answers Ground-Mounted Solar Photovoltaic Systems (Clean Energy Guide)[7] and (2) the Massachusetts 2050 Decarbonization Roadmap (Roadmap).[8]  
            The Clean Energy Guide was issued in June 2015 by the Department of Energy Resources "to help local decision-makers" in the siting of solar energy systems with a goal of ensuring "that solar [photovoltaic] and other clean energy technologies are sited in a way that is most protective of human health and the environment, and minimizes impacts on scenic, natural, and historic resources."  Clean Energy Guide at 3.  The Clean Energy Guide "strongly discourages" the siting of solar energy systems in locations that will "require significant tree cutting."  Id. at 4.
            The Roadmap was issued in December 2020 by the Executive Office of Energy and Environmental Affairs to "identify cost-effective and equitable strategies to ensure Massachusetts achieves net-zero greenhouse gas emissions by 2050."  Roadmap at 1.  Among other things, the Roadmap states that "[n]atural lands and ecosystems play a critical role in regulating the amount of [carbon dioxide] in the atmosphere.  Forest ecosystems significantly contribute to this activity, especially in New England."  Id. at 74.
            In addition to relying on the Clean Energy Guide and the Roadmap in voting to deny Sunpin's application, Reynolds also cited to various provisions of the bylaw and specifically noted that her "nay" vote was consistent with the board's responsibility to promote the health, safety, and general welfare of the public.  She concluded that,
"[a]pproving a special permit for the proposed project would be inconsistent with the Bylaw because it would not encourage the most appropriate use of land.  Petersham wants to avoid the usual, unfortunate trajectory:  first, natural lands are fragmented and punctuated with houses and businesses, then, as additional waves of development occur, built areas are joined together and filled in until the remaining natural lands have been fragmented into small, isolated pieces with greatly reduced environmental value.  While we can't predict the future, granting [Sunpin] a special permit for the proposed project would facilitate this trajectory and therefore should be denied."[9]
In addition, Reynolds noted the project would destabilize nearby property values, as expressed by one abutter at the public hearing.[10]
            Discussion.  We review a grant of summary judgment de novo.  Williams v. Board of Appeals of Norwell, 490 Mass. 684, 689 (2022).  "[S]ummary judgment is appropriate where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law" (quotation and citation omitted).  Id.  When both parties have moved for summary judgment, the evidence is viewed "in the light most favorable to the party against whom judgment is to enter."  Eaton v. Federal Nat'l Mtge. Ass'n, 93 Mass. App. Ct. 216, 218 (2018), quoting Albahari v. Zoning Bd. of Appeals of Brewster, 76 Mass. App. Ct. 245, 248 n.4 (2010).
            We note at the outset that "standalone, large-scale [solar energy] systems, not ancillary to any residential or commercial use, are key to promoting solar energy in the Commonwealth."  Tracer Lane II Realty, LLC v. Waltham, 489 Mass. 775, 781 (2022) (Tracer Lane).  The Legislature has protected solar energy installations from local regulation by G. L. c. 40A, § 3, ninth par., which provides that "[n]o zoning ordinance or by-law shall prohibit or unreasonably regulate the installation of solar energy systems or the building of structures that facilitate the collection of solar energy, except where necessary to protect the public health, safety or welfare."  Tracer Lane, supra at 779.  "When interpreting this paragraph, we keep in mind that it was enacted to help promote solar energy generation throughout the Commonwealth."  Id.  Indeed, the Supreme Judicial Court has applied G. L. c. 40A, § 3, ninth par., to invalidate a local zoning provision that prohibited large-scale solar energy systems in all but one to two percent of land area in the municipality, where the prohibition was not reasonably grounded in public health, safety, or welfare.  See Tracer Lane, supra at 781-782.  While it is true that "municipalities have more flexibility in restricting solar energy systems than they do, for instance, in the context of education, religion, or child care," "stringent limitation" not "necessary to protect the public health, safety or welfare," "violates the solar energy provision" (citation omitted).  Id. at 781.
            Here, the parties do not challenge the validity of § 18 of the bylaw, and agree that the town's special permit requirement set forth in § 18 does not violate the protections afforded by the ninth paragraph of G. L. c. 40A, § 3.[11]  The parties also agree that "[l]ike all municipalities, [the town] maintains the discretion to reasonably restrict the magnitude and placement of solar energy systems."  Tracer Lane, 489 Mass. at 782.  Accordingly, our analysis focuses on the question whether the board abused its discretion under the special permit section of the bylaw, keeping in mind that the Legislature has determined that no regulation may prohibit a solar energy installation unless reasonably grounded in public health, safety, or welfare.  Put another way, the question before us is whether the board used the special permit requirement to impose its own preference that large-scale solar energy systems not be placed in wooded areas.  See Prime v. Zoning Bd. of Appeals of Norwell, 42 Mass. App. Ct. 796, 802-803 (1997) (special permit may not be denied to prohibit protected use or impose board's preference).  See also Wendy's, 454 Mass. at 387 (we review whether reasons given by board "had a substantial basis in fact, or were . . . mere pretexts for arbitrary action or veils for reasons not related to the purposes of the zoning law" [citation omitted]).  Here, as Reynolds's statement makes clear, the special permit was denied because the board preferred (on behalf of the town's inhabitants) a different use of the property, that is, to leave it in its natural state.  In other words, the permit was denied because the board concluded that maintaining forest land was preferable to solar energy development that involved tree removal.[12]  In reaching this conclusion, the board exceeded its discretionary powers.  "[N]either G. L. c. 40A, § 6, nor the by-law permits denial of a special permit based on an undifferentiated fear of the future.  Although a board may properly consider the reasonably likely impact of a particular use on an area's development potential, . . . a board may not deny a permit simply by conjuring a parade of horribles."  Britton, 59 Mass. App. Ct. at 75.  See Fitzsimonds v. Board of Appeals of Chatham, 21 Mass. App. Ct. 53, 57 (1985) (error to deny special permit because granting it might lead to future year-round occupancy; board improperly and impermissibly relied upon, "as bearing upon [the] present decision, a putative problem to be faced in the indefinite future").  "The board may not refuse to issue a permit for reasons unrelated to the standards of the by-law for the exercise of its judgment."  Slater v. Board of Appeals of Brookline, 350 Mass. 70, 73 (1966) (no discretionary power to deny special permit because board thought adjacent land might be more appropriate location for parking).
            Here, the town has addressed the specific issue of clearing natural vegetation for a solar energy project.  Section 18.9(b) of the bylaw allows the "[c]learing of natural vegetation . . . limited to what is necessary for the construction, operation and maintenance of the [solar energy] installation . . . ."  There is no suggestion that Sunpin will clear more natural vegetation than is necessary for the project's construction, operation, and maintenance.  Moreover, there has been no showing that this particular parcel has unique characteristics that render it unsuitable to house a solar energy project -- aside from the fact that it is wooded.  In this case, the board ignored the regulatory framework of the bylaw and imposed its view that tree removal -- even that limited to "what is necessary for the construction, operation and maintenance of the installation" -- "would not encourage the most appropriate use of [the] land."  As such, the decision was rendered in an "unreasonable, whimsical, capricious or arbitrary" manner.  Wendy's, 454 Mass. at 382, quoting Roberts v. Southwestern Bell Mobile Sys., Inc., 429 Mass. 478, 486 (1999).
            In reaching our conclusion, we are mindful that "[t]he board is entitled to deny a permit even 'if the facts found by the court would support its issuance.'"  Doherty v. Planning Bd. of Scituate, 467 Mass. 560, 566-567 (2014), quoting Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 475 (2012).  "[A] board's discretionary power of denial is not limitless:  it will be upheld up to those rarely encountered points where no rational view of the facts the court has found supports the board's conclusion" (quotations and citation omitted).  Wendy's, 454 Mass. at 383.  However, the board cannot deny a permit based on its preferences, or State "guidance" that has not been adopted by the Legislature or the town, particularly in view of the town's enactment of a bylaw provision that addresses the very issue of clearing natural vegetation for solar energy installations.  Indeed, the town acknowledged at oral argument that the town is at least ninety-seven percent forested -- a factor the town may well have considered in adopting the provision addressing clearing natural vegetation for solar energy installations.  Were it to deny a special permit for any large-scale solar electric installation project that requires clearing trees, there would be no distinction between the town's scheme and the one declared unlawful in Tracer Lane, 489 Mass. at 782.
            Here, Reynolds expressed concern about the siting of the project on property that would require cutting down a significant number of trees, because "[m]aintaining trees assists the Commonwealth's energy policy goals because of the important water management, cooling and climate benefits trees provide," and the removal of the trees would adversely affect "habitat for wildlife, recreational opportunities and sense of place for people."  While this may be so, the town specifically adopted a "solar electric installations" section of the bylaw for the purpose, among others, of "providing standards for the placement, design, construction, operation, monitoring, modification and removal of such installations that address public safety, [and] minimize impacts on environmental, scenic, natural and historic resources," which limits tree removal only to that amount necessary to install and maintain the array.  Those standards do not suggest that denial of the permit here was necessary to protect public health, safety, or welfare.  "More specific direction in the by-law is necessary to require such specialized review."  Mellendick v. Zoning Bd. of Appeals of Edgartown, 69 Mass. App. Ct. 852, 858 (2007) (special permit granting authority not obligated to consider "protection of endangered plant and animal species" in consideration of whether affordable housing "adversely affect[s] the neighborhood").  However important policies promoting preservation of woodlands may be, they have not been adopted by the town to an extent that would allow the board to reject the plaintiff's special permit application in the circumstances presented here.  Where the board's consideration of the special permit application was necessarily limited by the provisions of G. L. c. 40A, § 3, ninth par., and could not be used as a mechanism to promote the board's preference for a different use -- or no use -- of the land, the board's decision exceeded its lawful discretion and therefore is not valid, and summary judgment in favor of the board was not proper.
            The board contends that should we conclude, as we have, that its decision was improper, the proper result would be to direct a remand of the matter to the board for further consideration rather than order the board to issue the special permit.  It is true that "[i]n the ordinary course, a reviewing judge is reluctant to order a board to implement particular relief, . . . [b]ut an order of particular relief may be appropriate where remand is futile or would postpone an inevitable result."  Wendy's, 454 Mass. at 387-388.  See McLaughlin v. Zoning Bd. of Appeals of Duxbury, 102 Mass. App. Ct. 802, 814-815 (2023) (order directing issuance of special permit exceedingly rare where board has not considered whether reasonable conditions are appropriate).  Here, the town admits there were no issues affecting the public health, safety, or welfare, see G. L. c. 40A, § 3, ninth par., other than the destruction of trees, and has identified no other issues related to the bylaw's special permit criteria.  However, two of the members voted to approve the special permit with certain conditions designed to provide a screen for residential abutters.  Accordingly, we vacate the judgment and remand "for entry of an order remanding the case to the board to expeditiously issue the special permit after considering whether imposition of reasonable conditions is warranted."  McLaughlin, supra at 815.  On remand, the board will not have the power to deny the special permit; it may impose only reasonable conditions if warranted.
So ordered.
 
footnotes

 
            [1] Ralph P. Lapinkas, Jr.
            [2] The bylaw refers to "solar electric installations" while the statute uses the phrase "solar energy systems."  See bylaw § 18.1; G. L. c. 40A, § 3, ninth par.
            [3] We acknowledge the amicus brief submitted by the Solar Energy Industries Association and the Alliance for Climate Transition in support of the plaintiffs.
            [4] Our recitation is drawn from the parties' joint statement of facts, the board's decision, and other documents submitted in connection with the cross motions for summary judgment.
            [5] Several provisions of the bylaw pertain to the issues before us, including provisions regulating the composition of the board and special permit criteria, and § 18 is dedicated specifically to solar electric installations.  We set forth the various sections as follows.
            "SECTION 11.  BOARD OF APPEALS
"There is hereby established a Board of Appeals which shall consist of three members . . . .
"2.  Special Permits:  The Board of Appeals may grant a special permit for a special exception as provided in this By-law, when it shall have found that the use involved will not cause or give rise to noise, odor, dust, refuse, exterior lighting, traffic or other considerations which would be offensive or detrimental to the present or future character of the neighborhood or the community and if the Board finds that the proposed use will not derogate from the intent and purpose of this By-law.  Each such permit shall be subject to such conditions or safeguards as it may deem necessary or advisable. . . ."
            "SECTION 18.  SOLAR ELECTRIC INSTALLATIONS
            "1.  Purpose  
"The purpose of this bylaw is to facilitate the creation of new large-scale solar electric installations by providing standards for the placement, design, construction, operation, monitoring, modification and removal of such installations that address public safety, minimize impacts on environmental, scenic, natural and historic resources and to provide adequate financial assurance for the eventual decommissioning of such installations.
"a.  Applicability  
". . .
"This section applies to any large-scale ground-mounted solar electric installation (greater than 10 kW [kilowatts]) in the Town of Petersham.  In the Solar Electric Overlay District such facilities are allowed As-of-Right.  Outside of the Solar Electric Overlay District, such facilities are allowed by special permit.
". . .
            "9.  Safety and Environmental Standards
". . .
"b.  Land Clearing, Soil Erosion and Habitat Impacts
"Clearing of natural vegetation shall be limited to what is necessary for the construction, operation and maintenance of the installation or otherwise prescribed by applicable laws, regulations, and bylaws."
            [6] The Harvard Forest is a department of the Faculty of Arts and Sciences of Harvard University.
            [7] Department of Energy Resources, Department of Environmental Protection, and Clean Energy Center, Clean Energy Results Questions & Answers Ground-Mounted Solar Photovoltaic Systems (June 2015).
            [8] Executive Office of Energy and Environmental Affairs, Massachusetts 2050 Decarbonization Roadmap (Dec. 2020).
            [9] At the same time, Reynolds noted that Sunpin's request was the first special permit request for a solar energy project in the town but surmised that it would not be the last and that the board needed "to be especially cognizant of the precedent we are setting."
            [10] We note that Reynolds did not point to any concerns regarding odor, noise, dust, refuse, exterior lighting, or traffic -- several of the criteria set forth in the special permit section of the bylaw.  See bylaw § 11.2.
            [11] Under the bylaw, large-scale ground-mounted solar electric systems are allowed as of right only on a parcel of town-owned land consisting of 5.16 acres located near National Grid transmission lines, and all other proposed large-scale solar electric systems require a special permit.  In the absence of a challenge to the bylaw, "the rule of law [is] that there is a presumption in favor of the validity of a municipal ordinance or by-law."  Canton v. Bruno, 361 Mass. 598, 608 (1972).  Thus, we do not address the issue whether the town's scheme, including the special permit requirement, is valid.  But see Tracer Lane, 489 Mass. at 781 (outright ban of all large-scale solar energy systems in all but one to two percent of municipality's area is impermissible).  We do note, however, that "the special permit may not be imposed unreasonably and in a manner designed to prohibit [a use protected by G. L. c. 40A, § 3], nor may the permit be denied merely because the board would prefer a different use of the locus, or no use."  Prime v. Zoning Bd. of Appeals of Norwell, 42 Mass. App. Ct. 796, 802-803 (1997).
            [12] We note that nothing in the record or the bylaw suggests that a private property owner is restricted from cutting trees on his or her property.